[S. F. No. 9935. In Bank.—October 29, 1925.]

## SEID PAK SING et al., Respondents, v. HARRY B. BARKER et al., Appellants.

[Sac. No. 3352. In Bank.—October 29, 1925.]

## SEID PAK SING et al., Appellants, v. HARRY B. BARKER et al., Respondents.

[1] LEASES — INTERPRETATION OF PARTICULAR CLAUSES — NOSCITUR A SOCIIS.—While a written instrument as to the interpretation of any particular clause therein is to be read as a whole, and the particular clause or sentence thereof under scrutiny is not to be controlled as to its meaning by its position or context, the ancient maxim of *noscitur a sociis* has still some degree of application to the use of the context in determining the scope and meaning of the words, sentences, and clauses of contracts.

[2] ID.—RENTAL OF LARGE TRACT OF DELTA LANDS—AGREEMENT OF LESSOR TO PUT INTO CONDITION—INTENT.—In this action involving among other things, the proper construction of a lease of a large tract of delta lands, looking at the lease as a whole, it was obvious from the location of such lands, from the amount of rental to be paid per acre therefor, from the large advance payments in the form of negotiable promissory notes which the lessees were to make on account of the rental of said lands for the first year, from the nature and extent of the obligations assumed by the lessor, and, finally, from the rather unusual requirement in the lease that the lessor shall give to the lessee a mortgage upon a large part of the lands leased as security for the faithful performance on his part of the covenants therein to be by him performed, that it was the manifest intent of the parties to the lease that practically all of the lands covered thereby should presently be put into condition for intensive cultivation by the lessees through the performance on the part of the lessor of his express agreement to clear, levee, ditch, drain and plow the whole thereof, and to erect buildings thereon suitable for the uses of the lessees in the course of such intensive cultivation of the land.

[3] ID. — BREACH BY LESSOR — EXPENDITURES BY LESSEES — LOSS OF CROPS — RIGHT TO DAMAGES — PRO RATA RENTAL REDUCTION. — Where the lessor under such lease breached practically all of his covenants and agreements in said lease to drain, clear, plow, and thus render cultivatable the lands covered by said lease, and the

1.  See 6 R. C. L. 842.

lessees were thereby put to the necessity of making certain expenditures in the way of drainage or clearing or of work upon the ditches or levees upon or surrounding said lands in order to the cultivation thereof and to the planting of crops thereon or of the protection of their said crops when so planted, the lessees were entitled to the inclusion of some amount as to each of said items of outlay by them in arriving at the amount the return of which their mortgage was to secure, notwithstanding the lease provided (in the portion thereof dealing with the amount of annual rent to be paid per acre by the lessees) that "if any part of the land should not be sufficiently drained to make it susceptible of cultivation in the proper season, then the rental for the year of such season shall be diminished *pro rata* according to the amount of acreage so excluded from cultivation"; and the lessees were also entitled to a like inclusion of some amount as damages for their losses in crops occurring through the said breaches of some or all of the lessor's covenants.

[4] ID.—AMOUNT OF RECOVERY—PLEADING—FINDINGS—JUDGMENT—APPEAL.—Where the lessees in their complaint allege that, by reason of the breach by the lessor of his covenant to build and maintain proper levees, they were obliged to expend a specified sum in doing said work, and the court finds that the lessees actually expended a much larger sum in doing the work of building, maintaining, and repairing said levees, but further finds that only a lesser sum (substantially the sum asked in the complaint) was expended in and for the protection of crops planted by the lessees and grown on the demised premises, and the appeal by the lessees is on the judgment-roll alone, the disallowance of the difference between the sum found to have been actually expended and the amount allowed on account of such expenditures will not furnish sufficient ground for reversal, even though the reasons given by the trial court for making the deduction should be deemed to be erroneous.

[5] ID.—BREACH BY LESSOR—DAMAGES—JUDGMENT.—The trial court having found that the lessees expended a certain sum of money to clear certain portions of said land from brush, willows, and tules after the lessor's failure to keep the covenants of his lease in that regard, the conclusions and judgment of the trial court should have responded to its findings to the effect that such expenditure had been necessarily and properly made, and its failure in any measure whatever so to do, because of the provision in the lease for a *pro rata* reduction of the annual rental, was error on the part of the trial court; and the trial court likewise erred in not allowing anything for the lessees' loss in profits in crops and in loss of seed purchased but not planted upon said lands due to the lessor's failure to keep the covenants of his lease.

[6] ID.—CONSTRUCTION OF AGREEMENT—INTENT OF PARTIES—CONTEMPORANEOUS EVIDENCE.—In construing a clause in a lease relating to the diminution of the rental according to acreage in the event portions of the lands leased shall not be rendered susceptible of cultivation through insufficient drainage, evidence tending to show the preliminary discussion between the attorneys for the respective parties to said lease, during the preparation thereof as to the protection to be afforded the lessor by the wording and insertion of said clause, is not entitled to controlling weight, where the said clause from its position and terms is sufficiently clear in its scope and meaning as not to be aided by contemporaenous evidence touching its interpretation.

[7] ID.—LOSS OF GROWN CROPS—LIQUIDATED DAMAGES—INVALID COVENANT.—A provision in a lease fixing the liability of the lessor at a specified sum per acre for damages sustained by the lessees through the lessor's failure to fulfill the covenants and obligations of his lease, as applied to grown crops actually destroyed before harvesting, comes fully within the inhibition of section 1670 of the Civil Code against stipulated damages and does not come within the exception to the rule embodied in section 1671 of said code.

[8] ID.—DESTRUCTION OF MATURED CROPS—MEASURE OF DAMAGES.— The measure of damages for the entire destruction of a matured potato crop is the value thereof at the time and place of destruction; and it is error for the trial court to admeasure the damages sustained by the average market price during the year, less certain expenses for digging, sacking, and hauling to market.

[9] ID.—BREACH BY LANDLORD OF COVENANT TO MAKE REPAIRS—ATTEMPT OF TENANT TO REMEDY—DUE CARE—RECOVERY OF DAMAGES. Where a tenant undertakes to make repairs to the premises he occupies which the landlord has covenanted but failed or refused to make, and the tenant uses due care and skill in attempting to make such repairs but damage nevertheless results from the defect which it was the duty of the landlord to repair, the tenant may recover such damages as have been caused by the breach of the landlord's obligation in the first instance to effectually perform his covenant in that regard.

[10] ID.—WRONG OF LANDLORD—ATTEMPT OF TENANTS TO REDUCE EFFECTS—CARE REQUIRED.—The duty of the tenants in attempting to

6. See 6 Cal. Jur. 265.

7. See 8 Cal. Jur. 851; 8 R. C. L. 570.

8. Measure of damages for injury to or destruction of growing crops by overflow, notes, 12 L. R. A. (N. S.) 267; 27 L. R. A. (N. S.) 168; 37 L. R. A. (N. S.) 976; 49 L. R. A. (N. S.) 415. See also, 8 Cal. Jur. 717, 819; 8 R. C. L. 378.

do work which the landlord was obligated to perform is to use such care and diligence as a man of ordinary prudence would use under the circumstances although they may not have done the very thing nor used the very means that should have been used as developed by subsequent information; and the effort of the tenants to reduce the effects of the landlord's wrong are to be confined to such efforts as are reasonable and made in good faith.

[11] ID.—KNOWLEDGE OF DEFECT—ASSUMPTION OF RISK—BREACH BY LESSOR—RECOVERY OF DAMAGES.—The fact that the lessees took possession of the leased premises and planted crops thereon in the presence and existence and with knowledge of obvious defects in the levees and consequent danger of overflow did not deprive them of the right to recover damages for the resultant overflow due to such original defects, as the lessees had the right to rely upon the lessor's express covenant to properly construct and repair said levees within a stated time, which time was made the essence of the contract, and it was only after the failure of the lessor so to do had been prolonged until the danger of overflow became imminent that the lessees, after vainly insisting that the lessor immediately proceed to perform his covenant, undertook by doing work themselves upon the levees to prevent such threatened overflow.

[12] ID.—CAUSE OF BREAK IN LEVEES—FINDINGS—EVIDENCE.—There was no merit in the contention of the lessor that the breach in the levees from which the lessees' chief damage arose was caused by the lessees' own acts in placing and operating upon said levees certain large machinery, the operation of which and the jarring caused thereby were directly responsible for the breach in the levees which occurred within a short distance from where such machinery was being thus operated, where the evidence taken as a whole was sufficient to support the express finding of the trial court to the effect that the break in the levees was not due to such cause and the further express finding that the operation of the lessees in seeking to repair said levees were properly and skillfully done.

[13] ID. — PROSPECTIVE PROFITS — MEASURE OF ACTUAL DAMAGES — LIQUIDATED DAMAGES.—Lessees are not to be deprived of their right to recover damages for loss of prospective profits by reason of their inability to farm a portion of the demised premises due to the lessor's breach of certain express covenants in the lease, merely because of the disadvantages and difficulties in the way of providing an accurate measure of the actual damages sustained; and, in view of such difficulties, a provision in the lease for liquidated damages as to prospective profits will be upheld as within the exception provided for in section 1671 of the Civil Code.

[14] ID.—LIQUIDATED DAMAGES—SEVERABLE VALID PROVISION.—Where
the provision in a lease for the fixation of a specified sum per acre
for the destruction of growing crops through the breach of the
lessor's covenants to repair and maintain the levees so as to pro-
tect such crops from inundation is severable from the provisions
in said lease fixing a specified sum per acre as the agreed dam-
ages for the general violations of the lessor's covenants, the in-
validity of such first provision as to the damages to grown crops
will not render invalid the later and severable provisions of the
lease in so far as they furnish an agreed amount of damage for
the loss of prospective crops.

[15] ID.—BREACH BY LESSOR—MEASURED DAMAGES—RETURN OF RENTAL
—LOSS OF CROPS—ELECTION.—Where, notwithstanding the lessor's
breach of covenants in the lease, the lessees remain in possession
of parts or all of the demised premises they are not entitled to a
judgment for the return of rentals paid by them and also to a
judgment for damages arising by reason of interference with
their use, occupation, and cultivation of the leased lands or for
the loss of crops in the course of such cultivation, but they must
make their election as to which form of relief they will stand upon.

[16] MORTGAGES—FAILURE OF DEFENDANTS TO PRODUCE AND SURRENDER
DOCUMENTS — CONTEMPT OF COURT — LOSS OF LIEN — ERRONEOUS
JUDGMENT.—In an action by the holder of a junior encumbrance
to establish the validity of such encumbrance and the prior encum-
brance and for an accounting to determine the amount of the
indebtedness secured by each, while the holders of the note and
deed of trust representing the prior encumbrance may be held in
contempt of court in failing to produce and surrender same in
accordance with the direction of the court, to the end that they
might be surrendered to the plaintiffs upon their deposit and pay-
ment of the amount found due thereon and secured thereby, the
failure or refusal of the defendants to comply with such order
will not justify the court in making an order relieving the plain-
tiffs of the duty to pay and satisfy said amount found due thereon
and which the trial court found to be a first lien upon the premises.

[17] ID. — FORECLOSURE AND SALE — DEFICIENCY JUDGMENT AGAINST
AGENT.—In an action to foreclose a mortgage given by the lessor
as security for the performance of the covenants of the lease on
his part agreed to be performed, it is error for the trial court to
insert in the judgment a provision that, in the event the premises
should not upon the sale thereof under the order for the foreclosure
of said mortgage produce an amount sufficient to pay the amounts

14. Rights and remedies of tenant who remains in possession
of all or part of premises against a landlord for interference with
his possession or enjoyment thereof, notes, 20 A. L. R. 1369; 28
A. L. R. 1333.

found due to the plaintiffs and secured thereby, together with the
costs and expenses of such foreclosure sale, a deficiency judgment
should be docketed for the balance due against the grantee of the
lessor, and that the said plaintiffs have execution against said
defendant therefor, where the trial court further finds that said
defendant grantee in each and all of the several transactions by
which he became the assignee of the lessor was acting as the agent
of a designated one of his codefendants, and not otherwise.

---

(1) 13 **C. J.**, p. 527, n. 43, p. 531, n. 71; 29 **Cyc.**, p. 1065, n. 16.
(2) 35 **C. J.**, p. 1177, n. 24.    (3) 35 **C. J.**, p. 1177, n. 25.    (4) 4
**C. J.**, p. 663, n. 92.    (5) 36 **C. J.**, p. 165, n. 90.    (6) 35 **C. J.**,
p. 1178, n. 37.    (7) 17 **C. J.**, p. 932, n. 42.    (8) 17 **C. J.**, p. 887,
n. 21, 22; 36 **C. J.**, p. 165, n. 90.    (9) 36 **C. J.**, p. 153, n. 56.
(10) 36 **C. J.**, p. 159, n. 62 New.    (11) 36 **C. J.**, p. 153, n. 60 New.
(12) 36 **C. J.**, p. 165, n. 79.    (13) 36 **C. J.**, p. 167, n. 10.    (14) 17
**C. J.**, p. 932, n. 42.    (15) 36 **C. J.**, p. 160, n. 88, 89, 89 New, p. 167,
n. 15, 15 New, p. 413, n. 83, p. 665, n. 15 New.    (16) 13 **C. J.**,
p. 9, n. 66, p. 92, n. 34 New.    (17) 27 **Cyc.**, p. 1749, n. 61.

APPEALS from a judgment of the Superior Court of
San Joaquin County. George F. Buck, Judge. Reversed.

The facts are stated in the opinion of the court.

A. H. Ashley and Sterling Carr for Plaintiffs, Respondents and Appellants.

Miller, Thornton & Miller, Platt Kent, Elston, Clark &
Nichols and Sloss, Ackerman & Bradley for Defendants, Appellants and Respondents.

RICHARDS, J.—There are in this case two appeals, one
by the plaintiffs from certain portions of the judgment, and
it is taken upon the judgment-roll; the other by the defendants from the whole judgment, and is based upon the entire
record.   The plaintiffs' appeal, though not first in the order
of its taking, will be first considered and disposed of before
passing to a determination of the larger questions embraced
in the defendants' appeal.   The action as originally brought
was one to establish the right of the plaintiffs as the owners
and holders of a junior mortgage upon certain premises
to redeem said premises from the lien of a prior deed of
trust upon the same owned and controlled by certain of the
defendants, and to fix the basis of such redemption.   The

facts with relation to the earlier phases of this controversy are undisputed and may be briefly summarized as follows: During the early part of the year 1917 one John Landers was possessed of certain large tracts of delta lands lying some fifteen miles south of Stockton, containing in excess of 780 acres of land and being the whole of what is known in that region as "Mildred Island." During the summer of that year Landers borrowed $35,000 from the San Joaquin Valley Bank, a corporation, which was represented in a promissory note for said sum, dated June 21, 1917, executed by John Landers and Marie Landers, his wife; and as security for the payment of said note the makers thereof executed a deed of trust covering all of the lands known and described as Mildred Island, of which said deed of trust the San Joaquin Valley Bank was made the beneficiary, and two other certain persons were named therein as the trustees thereof. This deed of trust while executed upon the said date was, as the trial court found, not delivered until the fifth day of November, 1917. It was also not the first encumbrance upon certain portions of said lands, since at the date thereof there was an outstanding mortgage upon a portion of said lands in favor of one Henry E. Bothin upon which, as the trial court found, there remained a balance due of $13,000, but which indebtedness has since been satisfied. There was also about 145 acres of said tract which was still standing of record in the names of persons and corporations other than John Landers and wife. On or about the twenty-first day of September, 1917, the said John Landers, purporting to act as the owner of the above premises as a whole, made and entered into a lease thereof to Pak Sing, also known as Seid Pak Sing, and Sing Kee Company, a copartnership, for a period of two years, commencing on the first day of January, 1918, and ending on the thirty-first day of December, 1919. The premises described in said lease as comprising the whole of Mildred Island were therein estimated as containing a total acreage of 1,237.58 acres, the annual rental of which was for the first year to be $25.50 per acre of the lands leased as so described, and for the second year the sum of $26 per acre of the lands so leased. The acreage was to be measured and determined by the area within the compass of the center of the levee. No deduction was to be

made therefrom of the pieces or parts of the land used for canals, ditches, or drainage purposes, but it was provided that though the measurement thus prescribed should determine the acreage for the purpose of fixing rental, the levee itself and all convenient space thereabout was not to be included within the lease but the absolute possession, control, and custody thereof should remain in the owner, nor was the cultivation of the land by the tenant to extend beyond the base of the levee. In this portion of the lease thus designating the area and measurement of the land upon the basis of which the rentals were to be estimated it was provided as follows: "But if any part of the land should not be sufficiently drained to make it susceptible of cultivation in the proper season, then the rental for the year of such season shall be diminished *pro rata* according to the amount of acreage so excluded from cultivation." The tenants covenanted and agreed to pay the rent prescribed in said lease in the following manner, to wit: $10,000 on the first day of September, 1918; $10,000 on the first day of October, 1918; the balance for the year 1918 on the first day of November, 1918; $10,000 on the first day of September, 1919; $10,000 on the first day of October, 1919; the balance for the year 1919 on the first day of November, 1919. Upon the date of the execution of the lease the tenants were to make and deliver to the lessor three promissory notes each in the sum of $10,000 which should be evidence of the rental to be paid for the first year of the term of the lease and which notes should be absolutely negotiable and not subject to any equities between the parties arising out of the lease or however arising. As security for the payment of the rent reserved for the second year of the term of the lease and of the performance of all of the terms and conditions thereof the tenants were to deposit with the lessor on the fifth day of January, 1918, the sum of $5,000 with which they were to be credited upon the last installment of their rent. The tenants were also to make and deliver to the lessor on the first day of January, 1919, a chattel mortgage upon an undivided one-fourth of the growing crops upon said lands as further security for the payment of the rent and performance of the covenants of said lease by the said lessees to be performed during the second year of the term thereof. On the part of the lessor it was agreed that "if

during the life of this lease any part of the crops grown by the tenant shall be destroyed by reason of the breaking of the levee or by reason of the failure of the owner to keep and perform the terms and conditions of this lease, the owner shall pay to the tenant for each acre of crop totally destroyed the sum of $40.00. If the destroyed and damaged crops should be less than total then the owner shall pay to the tenant therefor for each acre of crop so partially destroyed and damaged a due and proper *pro rata* of said sum of $40.00, the amount of such *pro rata* to be determined by the parties hereto''; or in the event of disagreement by arbitration. There was also a provision, to be commented upon hereafter, fixing a like amount as damages for any and all breaches of the terms and covenants of said lease by the lessor or his assigns. As further security for the performance of the obligations of the owner to the tenants under the terms of said lease it was provided that the owner should give to the tenants a mortgage upon the southerly 780 acres of the leased lands which should be prior to and prevail over any other lien or encumbrance except the deed of trust above referred to. The covenants of the owner with the tenants followed. They were (a) to clear the land of tule and willow roots; (b) to plow the land once; (c) to erect certain camps, buildings, barns, and warehouses of designated dimensions upon the land; (d) to install all siphons necessary for the growing of potatoes, beans, and other crops; (e) to drain to the necessary depth seepage water as desired by tenants; (f) to install ditches and pipes necessary for seepage water; (g) to install, maintain, and operate the necessary pumping plant and apparatus for drainage of land; (h) to construct and maintain all necessary drainage ditches, canals, and bridges. The owner further covenanted that the camps and buildings should be ready for occupancy on the first day of January, 1918; that the said land should be ready for cultivation as follows: The southerly 780 acres thereof on the first day of February, 1918, and the remaining acres thereof on the first day of March, 1918. There were certain other minor and auxiliary covenants on the part of both of the parties to the lease and it was provided therein that every term, condition, and covenant of the lease whether expressed or implied is of the essence thereof and shall at the option of

the party not offending constitute ground for the forfeiture thereof or for the enforcement of such other covenants as were therein or by law provided. Finally it was provided that the terms, conditions, and covenants of the said lease should inure to the benefit of and be binding upon the heirs, executors, successors, and assigns of the parties thereto.

The parties to this lease having executed the same entered upon the performance of its terms, covenants, and conditions at the times provided therein, and as a result of the performance and nonperformance on the part of the respective parties thereto the lessees thereunder commenced the present action by filing their original complaint on January 26, 1919; wherein, after alleging their own qualification to bring and maintain this action, they alleged that said John Landers was, on or about June 21, 1917, the owner of the lands in question with the exception of the portions thereof above noted and that on said date he with his wife executed the deed of trust above referred to and that the said deed of trust became effective by delivery on or about the third day of November, 1917; that the said John Landers as lessor on the twenty-first day of September, 1917, entered into and executed the lease above referred to, pleading in substance and effect its terms, particularly with reference to the provisions therein relating to the execution by the former of the mortgage to the plaintiffs which forms the basis of the present action as presented in plaintiffs' original complaint. In so doing the plaintiffs set forth *in haec verba* the provision in said mortgage that the same was given "as security for the faithful performance by said John Landers of the obligations, terms and conditions of the lease of all the above described lands," etc. The plaintiffs proceeded to allege that the deed of trust to which said mortgage had by its terms been subordinated was on January 10, 1918, duly and regularly assigned to the Bank of Italy, a corporation, and was thereafter and on December 9, 1918, by said Bank of Italy assigned to Harry B. Barker, one of the defendants herein, who thereupon appointed one H. B. M. Miller, another of the defendants herein, as trustee thereof in the place and stead of the trustees theretofore named therein; that at the time of these respective assignments of said deed of trust each

of the said assignees thereof, and also the trustee substituted
therein, had actual notice of said mortgage and of the fact
that the plaintiffs were the owners and holders thereof and
had also actual notice of the obligations for which said mort-
gage had been given as security and of the fact that the
said plaintiffs advanced and paid a sum in excess of $50,000
under the terms of said lease, a large part of which said
sum the plaintiffs had been obliged to pay by reason of the
failure of said John Landers to keep the obligations to be
by him kept and performed under the terms of said lease;
that on February 27, 1918, the said John Landers and wife
conveyed and transferred to Midland River Land Company,
a corporation, all of the premises described in said deed
of trust; that on October 1, 1918, said Midland River Land
Company conveyed said premises to Joseph Basile, Jr.; and
that on December 4, 1918, Joseph Basile, Jr., and wife
conveyed the said premises to Leonard J. Grossman, an-
other of the defendants herein; that said John Landers
and each and all of his said successors in the ownership or
possession of said premises, in violation of the terms of said
lease, have failed and refused, and still fail and refuse,
to give to the plaintiffs herein the possession of the lands
described in said lease with the exception of 152 acres
thereof and have failed and refused to clear said lands of
willows or tules or to plow the same or to perform the said
work agreed to be performed by said John Landers under
said lease, and that said plaintiffs have been damaged
thereby in the sum of $54,000, consisting in the sum of
$30,000 paid by plaintiffs upon their said three notes each
for $10,000, and of the further sum of $24,000 damages
sustained by the failure of the said Landers and his trans-
ferees to perform the said covenants of said lease. The
plaintiffs proceed to allege that the defendants H. B. Bar-
ker, H. B. M. Miller, and Leonard J. Grossman are each
agents and representatives of the defendant Chicago Bond-
ing and Surety Company, a corporation, and that the acts
and transactions of each of the said persons as above set
forth, including the acquisition of the properties covered
by said deed of trust by said Grossman, have been done as
the agents of and for the benefit and on behalf of the said
Chicago Bonding and Surety Company. That prior to the
commencement of this action the said defendants acting for

and on behalf of said corporation have been purchasing outstanding claims and liens against the properties described in said deed of trust, but which outstanding claims and liens were and are upon portions of said properties upon which said deed of trust was not a first lien and which said liens and claims are subsequent to the lien of the plaintiffs' said mortgage upon the lands covered thereby and upon which said deed of trust is a first lien. The plaintiffs then proceed to allege that according to their information and belief the defendants herein have entered into a fraudulent and unlawful conspiracy, scheme, and plan to cause the said properties described in said deed of trust to be sold not primarily for the payment of the promissory note for the sum of $35,000 which it secured but mainly and chiefly for the payment of many large and fictitious obligations which the said defendants allege they have purchased and for the payment of which they wrongfully allege they are entitled to sell said premises, but in order in fact to defeat and destroy the force and effect of the plaintiffs' said mortgage upon said premises; and that in furtherance of said scheme and plan these defendants procured the said Grossman to purchase the legal title to said premises prior to the twenty-first day of December, 1918, which was the date upon which an installment of interest fell due upon the said promissory note which said deed of trust secured; and conspired and agreed that said Grossman should not pay said installment of interest when so due in order to effect a default under the terms of said promissory note which would render the whole of said promissory note, both principal and interest, due and payable and thus enable the holder of said promissory note and the trustee under said deed of trust to proceed to sell said premises; and that in accordance with said scheme and conspiracy the said defendant Miller, as the trustee under said deed of trust, did, on the sixth day of January, 1919, cause notices of such sale to be given and published to the effect that said premises would be sold under said deed of trust on January 29, 1919, at public auction to the highest bidder; that thereupon and upon learning of the fact and date of said proposed sale the said plaintiffs on the dates of January 17 and 21, 1919, demanded of said defendant Miller that he advise them as to the amount necessary to redeem said

premises from the operation and effect of said trust deed and particularly from that portion of said premises upon which said deed of trust is a first lien; and that upon the twenty-second day of January, 1919, said Miller served upon said plaintiffs a notice to the effect that the sum of $185,000, with interest thereon from various dates, would be required to redeem said premises from the lien of said deed of trust, but that said Miller has failed and refused to advise plaintiff of the amount required to redeem that portion of said premises upon which said deed of trust is a first lien and upon which plaintiffs' said mortgage is a second lien from said deed of trust; that the aforesaid amount claimed as necessary to redeem said premises from said deed of trust is a padded and misleading amount and was made and furnished in an endeavor to prevent said plaintiffs from redeeming from said deed of trust as a first lien that portion of said premises upon which their said mortgage is a second lien, and also of preventing other persons from purchasing or bidding for said premises at said trust sale, so that the defendants might purchase said property at a sum far below its real value but free and clear of the plaintiffs' said mortgage thereon, and thus defeat the right of the plaintiffs to foreclose their said mortgage for the recovery of the said amounts advanced and paid out by said plaintiffs and secured thereby; wherefore the plaintiffs seek by this action to have the court ascertain and determine the actual amount due upon and secured by said deed of trust by a proper accounting and thus enable the said plaintiffs to redeem said premises from the same; and they also pray for an injunction and for general relief.

To this original complaint of the plaintiffs herein the defendants appeared and answered separately, the answers of these defendants being, however, substantially the same, and consisting in certain admissions as to matters of writing and of record, but otherwise of denials of the averments of said complaint either directly or upon, or for the want of information or belief. Certain of the defendants added to their answers certain special defenses not material to the present inquiry. In addition to the denials of the defendant Grossman's answer he presented an amended answer and cross-complaint, alleging in the latter certain matters upon which he sought affirmative relief. To this cross-

complaint the plaintiffs filed an answer and later, by leave of the court, a supplemental answer, putting in issue its averments. The plaintiffs, a little later applied for and were granted leave to present, and did present and file, an amended and supplemental complaint, wherein, after dealing with certain of the matters referred to in the defendant Grossman's amended answer and cross-complaint, the plaintiffs proceeded to set forth with much particularity the additional respects in which the said John Landers and his assigns had failed, refused, and neglected to perform the aforesaid covenants and obligations of said lease to be by them performed and also to set forth in detail the damages sustained by plaintiffs as a result thereof, and to pray for an accounting and for general relief against all of said defendants. To this supplemental complaint the said defendants united in an answer putting in issue its essential averments. The issues having been thus made up, the trial court proceeded with the trial of the cause, and upon its submission made and filed its findings of fact and conclusions of law. It is not necessary at this stage of the case and upon the plaintiffs' appeal to deal with these in detail or treat of any other portions thereof than those which are involved in the plaintiffs' said appeal from the portions of the judgment of which the plaintiffs by this appeal complain. These portions of the judgment thus appealed from by the plaintiffs may well, for clarity, be stated at this point in the language of the plaintiffs' notice of appeal:

"IV.

"That by reason of the provisions of the lease from said John Landers to said plaintiffs and providing, 'But if any part of the land should not be sufficiently drained to make it susceptible of cultivation in the proper season, then the rental for the year of such season shall be diminished *pro rata* according to the amount of acreage so excluded from cultivation'; plaintiffs are not entitled to recover the sum of Two thousand and fifty-five Dollars and thirty-eight cents ($2,055.38) expended by them for levee work, by reason of the fact that said sum of Two thousand and fifty-five Dollars and thirty-eight cents ($2,055.38) was not expended by plaintiffs in order to protect any crop or crops planted by plaintiffs on said Mildred Island and growing thereon at the time said sum was expended for levee work, and that .

plaintiffs are only entitled to recover under the terms of said lease the amounts expended by them for such levee work during the time said crops were planted or growing upon said Mildred Island, and in order to protect said crops.

"V.

"That by reason of the provision of the said lease from said Landers to the plaintiffs herein, which provision is set forth in paragraph IV of this judgment, the plaintiffs are not entitled to recover the sum of Seventeen thousand eight hundred and fifty Dollars and nine cents ($17,850.09) expended by them for cleaning the land upon Mildred Island of brush, willows and tules.

"VI.

"That by reason of the provision of the said lease from said Landers to the plaintiffs herein, which provision is set forth in paragraph IV of this judgment, the plaintiffs are not entitled to recover the sum of Fifty-one thousand two hundred and seventy-four Dollars and fifty-eight cents ($51,274.58) as net loss of profits for the year 1918 upon land not turned over or delivered to plaintiffs by John Landers or his assigns.

"VII.

"That by reason of the provision of the said lease from said Landers to the plaintiffs herein, which provision is set forth in paragraph IV of this judgment, the plaintiffs are not entitled to recover the sum of Two hundred and six thousand seven hundred and thirty-five Dollars and eighty-five cents ($206,735.85) as net loss of profits for the year 1919 upon land not turned over or delivered to plaintiffs by John Landers or his assigns.

"VIII.

"That by reason of the provisions of the said lease from said Landers to the plaintiffs herein, which provision is set forth in paragraph IV of this judgment, the plaintiffs are not entitled to recover the sum of Four thousand five hundred Dollars ($4,500) as loss of potato seed purchased in the year 1918 by plaintiffs to be planted upon said Mildred Island."

The plaintiffs' said appeal being upon the judgment-roll alone we are now to look at the findings and conclusions of the trial court having relation to the foregoing portions

of said judgment in order to determine whether they are or are not sustained thereby. With the question of the sufficiency of the evidence to justify its findings with respect to these particular matters we are not called upon at this stage of the case to deal. The trial court found in conformity with the pleadings and admissions of the parties that the lease in question had been entered into between them and hence of necessity, that the parties thereto had agreed to and were respectively bound by all of the conditions, covenants, and obligations therein which were on the part of the lessor and lessees respectively to be performed. The trial court further found, generally speaking, that the averments of the plaintiffs' original complaint, referred to in said findings by the numbers of the paragraphs thereof, were true. With respect to the averments of the plaintiffs' supplemental complaint the trial court found in the main and with certain exceptions and limitations hereinafter to be noted that the averments thereof referred to by the numbers of the paragraphs were true. In so doing the trial court found to be true, with the exceptions to be noted, the following averment of the said supplemental complaint embraced in paragraphs from XV to XX thereof, viz.:

"XV.

"John Landers and his assigns failed, neglected and refused to construct any (and during said term there was and there is no) levee whatever along said dredger cut on said Upper Division. That is to say, said 457.58 acres is, along said dredger cut, wholly unprotected. Said dredger cut extends from Middle River to Latham Slough and the waters of said slough and said river flow through said cut. Said levee not constructed was necessary and as necessary as any other levee referred to in said lease; but its construction was not even attempted by John Landers or his assigns; although its construction was a material part of the consideration for said lease, and although by Landers' agreement to construct the same, said tenants were induced to enter into said lease, as Landers and his assigns well knew. No canal or ditch has been dug nor attempted to be dug in or on said Upper Division. It has never been cleared nor attempted to be cleared of tules and willow roots. Neither has it been plowed once nor attempted to be plowed once by John Landers, nor by any of his assigns.

It has never been made ready nor attempted to be made ready for cultivation. It has been of no use, advantage, benefit or profit whatever to said tenants. It could have been safely leveed and protected, and ditched and drained, so that it could and would have been of use and profit to said tenants.

"John Landers and his assigns never constructed nor maintained, but failed, refused and neglected to construct or maintain on or around said Lower Division a levee of sufficient height to prevent the surrounding water, at times of high water or of high tides, from flowing over it in many places. It was never worked down nor smoothed. It cracked and its cracks were not filled. The material placed therein was never sufficient in quantity to weight it down and solidify the seepage of water seeping through the same. It was, during all of said term, like a sieve and in many places below ordinary high tide levels. By reason of such neglect, failure and refusal upon the part of John Landers and his assigns, there was not, at any time during said term, any necessary levee or any levee constructed or maintained in conformity with said lease. Said tenants, in an endeavor to protect themselves, prevent said Lower Division from being overflowed and make it ready for clearing, plowing and cultivation, at their own expense, caused work to be done on said levee around said Lower Division and necessarily paid and incurred liability therefor during said term in the total sum of $7574.81. Said work was properly and skillfully done and said charge therefor was reasonable. The construction and maintenance by Landers and his assigns of a sufficient levee around said Lower Division was a material part of the consideration on said tenants' part for their execution of said lease, and by said Landers' said agreement to construct and maintain such necessary levee they were induced to enter into said lease, as Landers and his assigns well knew.

## "XVI.

"John Landers and his assigns failed, neglected and refused to clear said leased land, or any part thereof, of tules and willow roots, or to plow the same once, except that in 1918 they so cleared and plowed 142.58 acres of said Lower Division. Said tenants were, for that reason,

197 Cal.—22

themselves compelled so to clear and plow once as much
of said leased land as was possible and in that behalf were
compelled to incur liability and have therefor paid or in-
curred liability in the sum of $17,850.09. Said clearing
and plowing by said tenants were necessary and the same
was as well, carefully and skillfully done as was, under
the circumstances, practically possible. The said charge
therefor was reasonable.

## "XVII.

"John Landers and his assigns failed, neglected and re-
fused to install, maintain and operate the necessary pump-
ing plant and apparatus for the drainage of said lands
after irrigation by siphons of the potatoes growing thereon;
and, as a consequence, said tenants were, at their own ex-
pense, compelled to repair, supply with fuel and operate
the pumping plant and apparatus installed by Landers and
as the capacity thereof was insufficient for such purpose, to
hire a larger floating pump, all at an expense of $6638.48.
Said repairing, supplying, operation and hiring were neces-
sary and said charge therefor was reasonable.

## "XVIII.

"John Landers and his assigns failed, neglected and re-
fused to install all siphons necessary for the growing of
potatoes; and, as a consequence, said tenants were, at their
own expense, compelled to install siphons necessary for such
purpose, at an expense of $410.66. Said installation thereof
was necessary and said charge therefor was reasonable.

## "XIX.

"John Landers and his assigns failed, neglected and re-
fused to construct or maintain all necessary drainage
ditches, canals and bridges. As a consequence, said tenants
were compelled at an expense of $2202.45 to construct
and maintain the same. These were necessary and said
charge therefor was reasonable.

## "XX.

"John Landers and his assigns failed, neglected and
refused to drain to the necessary depth, seepage water
as desired by said tenants."

With respect to the averments of paragraph XV of said
supplemental complaint above quoted the trial court found
the same to be true with the exception "that the amount
expended by plaintiffs in the building, maintenance and

repairs upon the levees mentioned in said paragraph was the sum of $9620.81 instead of the sum set forth in said paragraph XV; that of said sum of $9620.81 so expended by said plaintiffs in the said work referred to in said paragraph XV of said supplemental complaint, the sum of $7565.43 was expended by said plaintiffs in and for the protection of the crops planted by plaintiffs and growing or to be grown upon said premises.''

With respect to the averments of paragraph XVII of the supplemental complaint above quoted the trial court found the same to be true except ''that the expense incurred by said plaintiffs for the work mentioned in said paragraph was the sum of $6855.03 instead of the sum referred to in said paragraph'' ($6638.48). In its conclusions of law, and also in its judgment predicated thereon, the trial court in dealing with the elements of the plaintiffs' alleged damages founded upon the foregoing alleged breaches of the covenants and conditions of the lease to be by the lessor and his assigns performed and the consequences which flowed therefrom concluded and adjudged that by reason of the clause in said lease providing as follows: ''But if any part of the land should not be sufficiently drained to make it susceptible of cultivation in the proper season, then the rental of the year of such season shall be diminished *pro rata* according to the amount of acreage so excluded from cultivation,'' the plaintiffs were not entitled to recover the sum of $2,055.38 expended by plaintiffs for levee work as averred by them in paragraph XIX of their supplemental complaint which the court in its findings had found to be true. The trial court further in its said conclusions of law and judgment concluded and adjudged that by reason of the provision of said lease last above quoted the said plaintiffs were not entitled to recover the sum of $17,850.09 alleged by them to have been properly expended by them for clearing the land of brush, willows, and tules according to the averments of paragraph XVI of their supplemental complaint which the said court in its findings found to be true. The trial court further in its said conclusions of law and judgment concluded and adjudged that by reason of the provisions of said lease last above quoted the said plaintiffs were not entitled to recover the sum of $51,274.58, alleged by plain-

tiffs to be the net loss of profits for the year 1918 from lands not farmed by said plaintiffs by reason of the failure and refusal of said lessor and his assigns to keep and perform the terms of said lease, as found by said court in its foregoing findings of fact, and particularly in paragraph XLIV thereof, wherein the court specifically found the said sum of $51,274.58 to be the profit which said plaintiffs would have netted from said unfarmed lands had the said lease not been breached by the said lessor and his assigns in the respects so alleged and found. The trial court further in its said conclusions of law and judgment concluded and adjudged that by reason of the provision in said lease last above quoted the said plaintiffs were not entitled to recover the sum of $206,735.85, alleged by plaintiffs to be the net loss of profits for the year 1919 upon land not turned over or delivered to and not farmed by said plaintiffs by said lessor or his assigns, as found by said court in paragraph XLV of its said findings of fact, and which net loss to said amount the said court in its said findings found the said plaintiffs to have sustained. The trial court further in its said conclusions of law and judgment concluded and adjudged that by reason of the provisions in said lease last above quoted the said plaintiffs were not entitled to recover the sum of $4,500 for the loss of potato seed purchased by them in the year 1918 for planting upon said lands as averred in paragraph XXII of their said supplemental complaint, which said court in its findings of fact found substantially to be true.

It is the foregoing five items in the conclusions of law and corresponding judgment of the trial court of which the plaintiffs complain upon this their appeal upon the judgment-roll. The first question thus presented is as to whether or not the trial court was justified in so interpreting the provision in said lease last above quoted as to deny the plaintiffs the specific remedy in damages as to these items which they sought and which the trial court found they had sustained by reason of the failure and refusal of the lessor and his assigns to put and keep the major portion of the lands covered by said lease in condition for cultivation and use by the plaintiffs for the purposes for which said lands had been leased by them for the term of said lease. If the conclusions of law of the trial court in the

foregoing respects are to find their justification solely in the interpretation which it has in each instance placed upon the last above quoted provision in said lease we are of the opinion that it was in error as to such interpretation and hence as to its legal conclusions based thereon. [1] While it is true that a written instrument as to the interpretation of any particular clause therein is to be read as a whole and that the particular clause or sentence thereof under scrutiny is not to be controlled as to its meaning by its position or context in the instrument, it is also true that the ancient maxim of *noscitur a sociis* has still some degree of application to the use of the context in determining the scope and meaning of the words, sentences, and clauses of contracts; and it may, therefore, be noted as a matter of some significance that the clause in this lease last above quoted is to be found in that portion thereof which deals with the amount of annual rent to be paid per acre by the lessees and not in that portion of said lease which purports to deal with the covenants and obligations of the lessor with relation to the placing and keeping of said lands in a condition for cultivation and with the penalties which are prescribed for the failure or refusal on the part of the lessor to perform his several covenants in that regard. [2] Looking to this lease as a whole it would seem to be obvious from the location of these lands, from the amount of rental to be paid per acre therefor, from the large advance payments in the form of negotiable promissory notes which the lessees were to make on account of the rental of said lands for the first year, from the nature and extent of the obligations assumed by the lessor, and, finally, from the rather unusual requirement in the lease that the lessor shall give to the lessees a mortgage upon a large part of the lands leased as security for the faithful performance on his part of the covenants therein to be by him performed, that it was the manifest intent of the parties to this lease that practically all of the lands covered thereby should presently be put into condition for intensive cultivation by the lessees through the performance on the part of the lessor of his express agreements to clear, levee, ditch, drain, and plow the whole thereof and to erect buildings thereon suitable for the uses of the lessees in the course of such intensive

cultivation of the whole of said land.  [3]  If we are cor-
rect in this conclusion it would seem irresistibly to follow
that the clause in said lease above quoted, which purports
to limit the amount of rental per acre which the lessees
were to pay to the acreage actually so drained as to be
susceptible of cultivation, would afford little if any sub-
stantial remedy to the lessees for the failure and refusal
of the lessor to do and perform those covenants which would,
if unperformed, work a defeat of the entire purpose of the
parties in engaging in the undertaking for the reclamation
and cultivation of this large tract of land as contemplated
by the terms of this instrument when read as a whole.  It
is to be noted that the trial court expressly found that the
insufficiency of drainage which rendered any portion of such
lands not susceptible of cultivation was that created solely
by the lessor's breach of the lease in that regard.

The respondents, however, contend that this provision in
the lease is to be interpreted to mean that as to whatever
acreage of said lands had not been prepared for cultivation
by sufficient drainage, such portion thereof was thereby to
be practically withdrawn from the terms of the lease so that
not only were the lessees to pay no rental therefor, but the
lessor was to be entirely relieved from the covenants and
obligations of said lease in respect to that portion of the
premises, and no longer to be held liable to respond in
damages for his failure to fulfill his agreement to do the
various acts provided in said lease to be by him performed
in order to properly drain said land and prepare the same
for cultivation.  The argument of the respondents in sup-
port of this contention is not convincing and the case of
*Edward Barron Estate Co.* v. *Waterman,* 32 Cal. App. 171
[162 Pac. 410], can hardly be said to be an authority in
support thereof, since in that case it appears that the lease
in question expressly provided that the sole penalty for
the delay in the completion of the building for occupancy
at the stated time was to be the abatement of the rent
during the period of such delay and that the lessees were
not to be entitled to any damage, rebate, or recoupment on
account of such delay other than that of the abatement of
the rent.  There is yet another reason why the failure of
the lessor to perform his agreements to reduce said lands to
such a proper state of drainage as to render them susceptible

of cultivation should not be given the effect of removing the said undrained acreage thereof from the operation and obligations of said lease. It is to be found in the very terms of the clause in said lease upon which the respondents rely since it is therein provided that the failure to so drain said lands as to render them susceptible of cultivation *"In the proper season* should only have the effect of diminishing the rental for the year of *such season."* It would thus seem that since the terms of this lease was two years covering two entire seasons of cropping, the failure of the lessor to properly drain the lands or any portion thereof during the planting season of the first year could have had no other effect than that merely of the diminution of the rental *pro rata* for that year, leaving the relations and the respective liabilities of the lessor and lessees as to the entire acreage of said lands entirely unchanged as to the occupation, preparation and use of the whole thereof for the second year of the lease.

It is further to be noted that said lease contains certain specific provisions fixing the amount of damages to be recovered by the plaintiffs in the event of the lessor's failure to perform his covenant to properly drain said lands in order to render them susceptible of cultivation. This stipulation in the lease is not only inconsistent with the foregoing clause therein, as interpreted by said defendants, but would be entirely unnecessary and ineffectual if said clause is to bear such interpretation.

It would follow from the foregoing considerations that if, as the trial court found, the said lessor had breached practically all of his covenants and agreements in said lease to drain, clear, plow, and thus render cultivatable the lands covered by said lease, and if, as the trial court found, the plaintiffs had been thereby put to the necessity of making certain expenditures in the way of the drainage or clearing or of work upon the ditches or levees upon or surrounding said lands in order to the cultivation thereof and to the planting of crops thereon or of the protection of their said crops when so planted, the conclusion of law from such findings of fact should have been that the plaintiffs were entitled to the inclusion of some amount as to each of the aforesaid items of outlay by them in arriving at the amount the return of which the plaintiffs' mortgage was to secure; and that the plaintiffs were also entitled to a like inclusion

of some amount as damages for their losses in crops occurring through the aforesaid breaches of some or all of the said lessor's covenants; and hence that in allowing no amount whatever in its conclusions of law and judgment on account of these items of outlay and of damage the trial court was in error.

When we come to estimate the extent and consequences of such error we are led to a consideration of each of the said several items which form the gravamen of the plaintiffs' present appeal.

[4] As to the first of the five items of alleged error on the part of the trial court there seems to be some confusion as between the plaintiffs' pleadings and the findings of the court which may render that particular item unavailable to plaintiffs upon their limited appeal. The plaintiffs in paragraph XV of their supplemental complaint alleged that by reason of the failure and refusal of the lessor to build or maintain proper levees the plaintiffs were obliged to expend, and did expend, the sum of $7,574.81 in doing the work to be done on said levees which the lessor had failed and refused to do in order to protect the said lands from being overflowed and thus rendered incapable of drainage or cultivation. The court found that the plaintiffs had actually expended the sum of $9,620.81 in doing the work of building, maintaining and repairing said levees, but also found that only $7,565.43 thereof was expended in and for the protection of crops planted by plaintiffs and grown upon said premises. In view of the fact that the plaintiffs were granted by the judgment substantially all that they asked, it would seem that the disallowances of the difference between the sum found to have been actually expended and the amount allowed on account of such expenditure would not furnish sufficient ground for reversal upon this appeal even though the reasons given by the trial court for making the deduction should be deemed by us to be erroneous.

[5] As to the second item for the exclusion of which the plaintiffs appeal, and which refers to the expenditure of $17,850.09 by plaintiffs to clear certain portions of said land from brush, willows, and tules after the lessor's failure to keep the covenants of his lease in that regard, it would seem that the conclusions of law and judgment of the trial court should have responded to its findings to the effect

that such expenditure had been necessarily and properly
made and that its failure in any measure whatever so to
do for the reason stated was error on the part of the trial
court.    The same reasoning based upon similar findings and
the proper conclusion to be drawn therefrom applies also
to the third and fourth items for the exclusion wholly from
the judgment this appeal is founded and which items refer
to the plaintiffs' loss in profits in crops for the years 1918
and 1919, which they were unable to plant upon a large
portion of said lands due to the lessor's failure to keep
his aforesaid covenants; and a like reasoning and conclu-
sion applies to the last of said items, which refers to the
plaintiffs' loss of potato seed purchased but unable to be
planted upon said lands by reason of the unavailability of
a large part thereof for cultivation and the planting of said
seed due to the lessor's breaches of said several covenants.

The respondents upon this appeal urge, however, several
considerations in addition to those above referred to, touching
upon the plaintiffs' present right to prosecute this appeal,
and also to the extent, if any, of their right to a reversal
of the judgment for the errors above adverted to.    The
defendants, in aid of the first of these considerations, pre-
sented a motion to dismiss this the plaintiffs' appeal; or in
the event of the denial of that motion, to have the court
limit the scope of said appeal as indicated in said motion.
We have concluded to deny these motions upon the authority
and for the reasons stated in the case of *Sing* v. *Barker,* 187
Cal. 587 [203 Pac. 737], and for the further and possibly
more cogent reason· that in view of the questions presented
upon this appeal and also upon the defendants' appeal from
the whole judgment and upon the entire record in the case,
we have deemed a review of the case in its entirety as pre-
sented upon both appeals expedient, if not essential to its
ultimate determination upon a retrial, which appears to be
inevitable.

The conclusion above arrived at, to the effect that the
plaintiffs were correct in urging upon this, their appeal, that
they were entitled upon the findings to a judgment awarding
them some measure of relief on account of the several items
which form the gravamen of their case upon appeal, brings
us to a consideration of the question as to what that measure
of relief should have been, and hence as to what the order

of this court should be in returning this cause to the trial court for the correction of its aforesaid errors. If the plaintiffs' appeal were the only appeal in the case before us the solution of this problem would be comparatively simple, requiring only a reference to such other of the findings of the trial court as the defendants and respondents upon this appeal rely upon as limiting the utmost measure in any event of the plaintiffs' remedies. The logical order is, therefore, to next consider the respondents' contentions in this regard. As to the item embracing ·the plaintiffs' outlay of $7,565.43 for the construction and maintenance of levees by the lessees, after the lessor had failed and neglected to so do, in order to prevent the overflow of said lands and to put them in condition for clearing and cultivation, the only objection which the appellants urge against the allowance of said item is that above considered and disallowed. The same may also be said of the item embracing the plaintiffs' expenditure of the sum of $17,850.09 for clearing the land of brush, willows, and tules after the lessor's failure to fulfill his obligations so to do. The respondents' main contention upon the plaintiffs' appeal other than those above considered is that as to the three last items for which disallowance of which the plaintiffs complain, the plaintiffs are not entitled to a ruling of this court that the trial court was bound to allow all or any of said items in their entirety based upon the court's findings as to the plaintiffs' losses in each of said regards, for the reason that if any amount whatever should be allowed on account thereof the terms of the lease as found by the trial court fix the amount of such allowance. The first two of the items last above referred to are those having to do with the plaintiffs' loss of profits for the years 1918 and 1919, arising out of the lessor's failure to deliver a large portion of the lands covered by said lease in a condition for the cultivation of crops ·with their resultant profits during each of these years. The third of said items relates to the plaintiffs' damage in the loss of potato seed purchased for planting upon said uncultivatable lands. As to the damages which the plaintiffs claim to have sustained from these three sources and which the trial court found to have actually amounted to a very large sum, the respondents contend that the following clauses in the lease limit the possible amount of the plaintiffs' recovery in any event to a fixed

and much smaller sum. The clauses in said lease thus relied upon by the respondents read as follows:

(a) "If during the life of this lease any part of the crops grown by the tenant shall be destroyed by reason of the breaking of the levee or by reason of the failure of the owner to keep and perform the terms and conditions of this lease by him to be kept and performed, the owner shall pay to the tenant for each acre of crop totally destroyed the sum of $40.00. If the destroyed and damaged crops shall be less than total then the owner shall pay to the tenant therefor for each acre of crop so partially destroyed and damaged a due and proper *pro rata* of said sum of $40.00; the amount of such *pro rata* to be determined by the parties hereto" (provision being made for arbitrators in the event the parties could not agree).

(b) "The liability of the owner hereunder shall not however exceed the said obligation to pay the forty dollars or the *pro rata* thereof as aforesaid: The amount so to be paid by him shall be the absolute measure of his responsibility or obligation to the tenant on any covenant, term and condition hereof."

(c) "The owners shall not be liable for damages to said land or to personal property sustained in or about said land however caused otherwise than as hereinabove provided. The tenant shall hold the owner harmless of liability for damage or injury to person or property caused by the use of said land by the tenant."

While the respondents herein insist upon their own appeal that the foregoing provisions of the lease are to be given express application to that portion of the findings and judgment of the trial court which undertook to find and award a large sum in damages to the plaintiffs for the total or partial destruction of a crop of potatoes due to the lessor's failure or refusal to put and keep the levees in a proper state of maintenance and repair and of which specific portion of the findings and judgment the plaintiffs do not upon this appeal complain, the respondents do herein contend that the aforesaid provisions of said lease are also broad enough in their terms or necessary implications to include every sort of injury which the plaintiffs might sustain by the breach on the part of the lessor of any or all of the covenants and obligations of said lease to be by him performed; and hence

that whatever relief this court may conclude that these plain-
tiffs are entitled to upon this particular appeal in the form
of pecuniary compensation for injuries sustained through
the lessor's breach of his covenants must be limited to the
sum of $40 per acre of the lands leased to them, and which,
upon the finding of a leased area of approximately 970 acres,
would amount at most to approximately $38,800.

In response to the foregoing contentions of the respondents
as to the meaning and effect to be given to the foregoing
provisions of said lease purporting to limit the amount of
the plaintiffs' relief against the lessor's breaches of the ob-
ligations of said lease, the appellants do not seriously or very
effectively argue that the said provisions of said lease are not
susceptible of the broad interpretation which the respondents
would have us place upon them; but they insist that if they are
to be given such interpretation they amount to nothing more
than an agreement for the payment of a penalty or of stipu-
lated damages for the breach of said obligation or series of
obligations and that if for a penalty they are void under
well-settled rules of law and if for the payment of stipu-
lated damages they are void under the provisions of sections
1670 and 1671 of the Civil Code. The plaintiffs further in
this connection contend that the question as to whether
under section 1671 of the Civil Code "It would be imprac-
ticable or extremely difficult to fix the actual damage" for
the breach of the obligations of a contract is a question of
fact for the determination of the trial court in each par-
ticular case; and that in this case the trial court has deter-
mined that question adversely to the defendants by its find-
ings based upon the evidence in the case that the plaintiffs'
damages for the lessor's several breaches of the obligations
of said lease were ascertainable and by ascertaining the
amount of the same for each separate breach thereof; and
furthermore that the presumption under section 1670 of
the Civil Code being that an agreement for the fixation in
advance of liquidated damages is void, it was incumbent
upon the defendants by proper pleadings and proof to
repel such presumption by showing that the contract falls
within the exception contained in section 1671 of the Civil
Code; and that the defendants have not sustained that bur-
den in this case as presented upon this appeal; citing *Thomas*

v. *Anthony,* 30 Cal. App. 217, 220 [157 Pac. 823], and cases cited. The further discussion, however, of the application of the foregoing sections of the Civil Code to the facts of this case may, for reasons which will then appear, be more profitably considered upon the defendants' appeal from the whole judgment and upon the entire record to which we shall now address ourselves.

The point which the defendants first and most strenuously urge upon their said appeal is the point which we have already considered and determined upon the plaintiffs' appeal, viz.: The interpretation to be placed upon the clause in said lease relating to the diminution of the rental according to acreage in the event portions of the lands leased shall not in any season be rendered susceptible of cultivation through insufficient drainage. [6] We find in the very elaborate arguments of counsel for the defendants on their appeal upon this point no sufficient reason for changing our conclusions in that regard; nor do we think that the defendants' contention for the first time urgable upon their appeal upon the whole record to the effect that there was some evidence offered tending to show that during the preliminary discussion between the attorneys for the respective parties to said lease, during the preparation thereof as to the protection to be afforded the lessor by the wording and insertion of said clause, is entitled to the controlling weight which the present appellants would assign to it. The said clause in the lease seems to us from its position and terms to be sufficiently clear in its scope and meaning as not to be aided by contemporaneous evidence touching its interpretation. We therefore hold that there is no merit in the first point urged upon the defendants' appeal.

[7] The next point urged by the defendants most earnestly upon their appeal is that already adverted to, viz., as to the application of sections 1670 and 1671 of the Civil Code to the provisions in said lease fixing the liability of the defendants at the sum of $40 per acre for damages sustained by the plaintiffs through the lessor's failure to fulfill the covenants and obligations of his lease. The defendants urge that the phrasing of said provisions, of the lease present the limited liability of the lessor and of his assigns in two aspects: First, that relating to the latter's liability for crops

wholly or partially destroyed by reason of the breaking of the levees or by reason of the failure of the lessor to keep and perform the terms and conditions of said lease and to be by him performed; second, that relating to a like agreed liability of the lessor for any and all other damage suffered by the lessees for any breach or breaches whatever of the covenants and obligations of said lease or otherwise on the part of the lessor. Under the first of these stipulations the defendants contend that the lessor was to be exempted from liability for the destruction of the crops of the lessees caused by the breaking of the levees beyond the limitation of $40 per acre of such crops so destroyed; while under the second and much more inclusive fixation of liability the lessor was not to be held in damages beyond said limited amount for any breach of his said obligations and particularly was not to be held liable beyond said sum for the loss of prospective crops and the profit therefrom due to the failure of the lessor to prepare, by drainage, clearing, plowing, and the maintenance of proper levees a large portion of the leased premises for cultivation and cropping during both cropping seasons embraced within the two-year term of said lease. As to the loss of grown crops actually destroyed through the inundation of the cultivated lands due to the breakage of the levees there would seem to be little doubt that the attempted fixation of liability on the part of the lessor for such losses in advance comes fully within the inhibition of section 1670 of the Civil Code against stipulated damages and does not come within the exception to the rule embodied in section 1671 of said code. The amount of $40 per acre of crops destroyed is denominated "damages" in the clauses of the lease limiting the recovery to that sum in the event of a total destruction of such crops occurring through the failure of the lessor to keep his obligations to protect such lands from overflow. The damages arising from the loss or destruction of merchantable crops is ascertainable under well-known rules of law. (*Tretter* v. *Chicago etc. Ry. Co.,* 147 Iowa, 375 [140 Am. St. Rep. 304, 309, and notes, 126 N. W. 339].) The appellants, however, cite cases to the effect that it lies within the power of parties to such agreements to entirely absolve the lessor from liability for such damages and that this being so they would have the power to fix the measure of damages to any sum short of such

entire absolution. The chief authority upon which they rely
in this behalf is the case of *Stephens* v. *Southern Pac. R. R.
Co.*, 109 Cal. 86 [50 Am. St. Rep. 17, 29 L. R. A. 751, 41
Pac. 783], wherein this court held that a railroad company
in giving a lease of lands adjoining its depot grounds might
insert a covenant wholly relieving the company from liability
for damage caused by fire from its engines. The rule laid
down in that case and followed in others cited by appellants
is doubtless correct but it by no means follows therefrom
that parties to contracts, who may stipulate in advance that
there shall be no liability for damages suffered by one or the
other from breaches of their respective obligations, may also
stipulate in advance for a fixed sum to be allowed in damages
for such breaches, since so to interpret these cases would be
to render wholly nugatory the provisions of section 1670
of the Civil Code respecting liquidated damages. In de-
termining, however, that the trial court did not err in hold-
ing void the stipulation relating to the fixation of damages
for the loss of the plaintiffs' potato crop at $40 per acre
of such crop destroyed we are not to be understood as up-
holding its entire action in that regard, since the appellants
further contend that in undertaking to admeasure such dam-
ages in disregard of the stipulation in the lease, the trial
court also disregarded and departed from the proper rules
of law for determining the plaintiffs' actual damages for
their loss of such crops. [8] The finding of the trial court
upon which its judgment was predicated allowing the plain-
tiffs the sum of $96,481.20 damages for the loss of their said
grown but yet unharvested crop of potatoes, reads as follows:

"That on or about the 9th day of October, 1919, said plain-
tiffs had and there was growing upon 222 acres of said 382.9
acres of said Lower Division, a crop of potatoes not har-
vested; that on or about said date the levee alongside of
dredger cut on said Lower Division, without any fault, act
or omission of said plaintiffs, or of any one acting for or
under them (but solely from the failure, refusal and neg-
lect of John Landers and his assigns to construct and/or
maintain said necessary levee) broke, and by reason of such
breaking said 222 acres of undug potatoes were overflowed,
ruined and totally destroyed, to plaintiffs' actual damage in
the sum of $96,481.20; that said damages are arrived at as
follows, to wit: That the average yield of potatoes per acre

during the year 1919 upon said premises was 164 sacks per acre; that the average market price at the place of destruction of said potatoes during the year 1919 was the sum of $3.15 per sack; that the expense of sacks for said potatoes for the year 1919 was the sum of 18½ cents per sack, and that the cost of digging potatoes was the sum of 25 cents per sack, and that the cost of hauling said sacks of potatoes from the field to the levee was the sum of 5 cents per sack, leaving the net value of said potatoes in the ground at the time of their destruction at the sum of $2.65 per sack; that 36,408 sacks of potatoes were so destroyed, of the value of $2.65 per sack in the ground, making the total loss to plaintiffs of the said sum of $96,481.20.''

It thus appears that the rule adopted by the trial court for admeasuring the plaintiffs' damages sustained in the loss of said crop of potatoes was based upon the average market price for the year 1919, less certain expenses for digging, sacking and hauling to market said potatoes. We are satisfied that such was not the proper rule to be applied to the admeasurement of said damages. The proper rule to be applied in such a case is that of the market value of the crop at the date of its destruction. It was so held in the case of *Teller* v. *Bay & River Dredging Co.,* 151 Cal. 209 [12 Ann. Cas. 779, 12 L. R. A. (N. S.) 267, 90 Pac. 942], wherein in a case similar in its main aspects with this one the rule and the authorities supporting it are very fully discussed. In 17 Corpus Juris, page 887, the principle is thus stated: ''The measure of damages for the entire destruction of a growing crop is its value at the time and place of destruction. A similar rule applies in case of the destruction of a matured crop''; citing many cases in support of the rule as thus stated. We therefore conclude that the trial court was in error in the rule it adopted for the ascertainment of the plaintiffs' damages for the loss of their matured potato crop upon lands actually cultivated by them in the season of 1919. The effect of such error will be considered in the later discussion of another phase of this appeal. A more difficult question immediately arises, however, relating to the plaintiffs' alleged but disallowed claim for damages for the loss in profits for crops unplanted by them during the seasons of 1918 and 1919 upon portions of said leased lands which were not rendered susceptible of

cultivation through the failure, neglect, and refusal of the lessor and his assigns to drain, clear, plow, and otherwise put into condition and protect for purposes of cultivation. It might be argued that this question does not arise upon this appeal since the trial court disallowed these claims. But since the said disallowance of these claims for prospective profits was predicated by the trial court upon reasons which upon the plaintiffs' appeal we have held to be inadequate; and since the tria_l court will be called upon to reconsider this subject upon a retrial of the cause we deem it proper to give to it such consideration as will hereafter appear. An interesting question arises as to whether such prospective damages for loss of profits to be derived by plaintiffs from those portions of said leased premises which they never did receive in a condition for cultivation and never did cultivate are not too speculative for admeasurement or recovery in this action; and also as to whether these damages are not so difficult of ascertainment as to give room for application of the limitation contained in the lease. These aspects of the case will be later herein considered.

We have thus arrived at a discussion of the most serious question which has been presented by the entire record upon this, the defendants' appeal. It is the question as to whether the plaintiffs are entitled to be allowed any damages whatever for the consequences of the breaking of the levees surrounding these leased lands and their resultant overflow and the destruction of existing or loss of prospective crops growing or to be grown thereon. The findings of the trial court in that regard show that at the time the lessor and lessees entered into this lease the levees surrounding the leased premises were in a bad state due to ill construction and disrepair; that the lessor undertook and covenanted to perform the work of placing and of keeping said levees in a proper state of construction, repair and maintenance to protect said premises from overflow; that the lessor failed and neglected to keep his covenants in that regard; that in the latter part of the year 1918 the plaintiffs notified the said lessor of his failure to perform his covenants in the foregoing regard and that it was necessary that such work should be done at once in order to protect the crops of the lessees growing on said premises from the danger of overflow; and that the lessor still failing and neglecting to do

197 Cal.—23

said work, the lessees a little later notified him that if he did not immediately proceed to keep and perform the terms and agreements of said lease requiring the doing of said work by him the lessees would immediately proceed to do and perform said work and hold the same and the cost thereof secured by their mortgage; that pursuant to said demands and notices the lessees did immediately thereafter take possession of said levees and did proceed to do work thereon by the aid of dredgers, pumping plants and other machinery and activities; that while they were so engaged in doing said work the levees broke at a point about sixty feet from the place where the large pumping plant of the lessees was in operation with the consequent flooding of the land and destruction not only of the crop of potatoes then being grown thereon but also with the effect of rendering practically all of the lands covered by said lease no longer susceptible of cultivation.

The trial court allowed the plaintiffs to include in the relief accorded them their claims for damages arising from the destruction of their grown crops of potatoes caused by said break in the levees, but it denied the plaintiffs any relief in the way of a recovery of damages for the losses in prospective profits from crops not susceptible of being grown upon the overflowed portions of said premises during the seasons of 1918 and 1919 for reasons which we have heretofore held to be an inadequate basis for such denial. It is, however, the further contention of the appellants herein that the plaintiffs are entitled to no recovery or relief for the damages sustained by them through the breaking of said levees, for the reason that when the plaintiffs took the possession and control of said levees and undertook to do the work thereon which the lessor had covenanted but failed to perform they assumed responsibility for the state of said levees and were to be held responsible for whatever happened thereafter by reason of the inadequacy of said levees to protect the lands of the plaintiffs under cultivation from overflow. The difficulty with this contention on the part of these appellants is that it leaves out of consideration the fact that the trial court in its findings, in dealing with the work done by the plaintiffs upon these levees, after they had undertaken such work, expressly found that the said work so undertaken by the plaintiffs "was properly and skillfully

done''; and further found that ''said levee . . . without any
act or omission of said tenants or of any one acting for
or under them (but solely from said failure, refusal and
neglect of John Landers and his assigns to construct said
necessary levee) broke, and by reason of said breaking and
consequent inundation said 200 acres of undug potatoes
were overflowed, ruined and totally destroyed.'' In the face
of these express findings it will be seen that the cases cited
by the appellants in support of their said contention have
no application to the situation here presented, since in each
and all of said cases the doing by the tenant or by the landlord
negligently or inefficiently of work which under the terms
of the lease they were not bound to do at all is made the
basis of all of these decisions denying recoveries to those,
whether tenants or landlords, for losses due to conditions
created by the improper or negligent performance of work
which they themselves, while not bound to do at all, had
undertaken to perform. The case of *Callahan* v. *Loughran,*
102 Cal. 476 [36 Pac. 835], may be said to fairly state the
rule which has quite uniformly been adhered to in the fore-
going regard. That was the case of a landlord who not
being bound to make certain repairs upon a stairway of
premises demised by him nevertheless undertook to do so.
The wife of the tenant was injured in descending such stair-
way at a time when she believed the landlord had completed
the work of making said repairs. In an action for the re-
covery of damages by the tenants for such injuries this court
held that it was necessary to allege and prove, in order to
such recovery, that said injuries had been caused by the
want of skill and care on the part of the landlord or his
workmen in making said repairs; and that failing in such
averment and proof the tenant was not entitled to recover.
(See, also, 16 R. C. L., pp. 1057, 1058.) [9] The same rule
has been held to apply to a tenant who undertakes to make
repairs in the premises he occupies which the landlord has
covenanted but failed or refused to make. If the tenant
uses due care and skill in attempting to make such repairs
but damage nevertheless results from the defect which it was
the duty of the landlord to repair he may recover such
damages as have been caused by the breach of the land-
lord's obligation in the first instance to effectually perform
his covenant in that regard. [10] In 1 Sutherland on

Damages, fourth edition, page 320, section 90, it is stated that the duty of the tenants in attempting to do work which the landlord was obligated to perform is such care and diligence as a man of ordinary prudence would use under the circumstances although they may not have done the very thing nor used the very means that should have been used as devolved by subsequent information; and at page 321 it is further stated that the efforts of the tenants to reduce the effects of the landlord's wrong were to be confined to such efforts as were reasonable and made in good faith. [11] The appellants, however, contend that, notwithstanding the found fact that the work which the plaintiffs undertook to do upon said levees after the lessor's default in keeping his covenants in that regard "was properly and skillfully done," such finding does not furnish an adequate reply to their contention that the plaintiffs are entitled to no relief or recovery in damages resulting from the breach in the levees for the reason that the defects in the said levees were obvious when the plaintiffs took said lease and undertook to cultivate and crop said lands, and hence that in taking possession of the same and planting crops thereon in the presence and existence and with knowledge of these obvious defects and consequent danger of overflow they took the risk of whatever breaches in the levees occurred thereafter, and hence are not entitled to recover damages for the resultant overflow due to such original and obvious defects. We do not understand the rule invoked by the defendants in this regard to go thus far. It is true, as found by the trial court, that the levees in question were poorly constructed and at the time of the making of the lease had certain obvious defects; but it does not appear from the findings or otherwise that the levees in question were not for the time being sufficient to restrain the waters of the river from coming in upon said lands at their normal elevation, but that for the better part of the year 1918 these levees though poorly constructed and not maintained in a proper state of repair did in fact restrain said waters from breaking through said levees and entering upon said lands. The plaintiffs in the presence of the express covenants of the lessor to properly construct and repair said levees within a stated time, which time was made the essence of the contract, had a right to rely upon the keeping of the said cove-

nant by the lessor, and it was only after the failure of the
lessor so to do had been prolonged until the danger of
overflow became imminent that the tenants, after vainly in-
sisting that the lessor immediately proceed to perform his
covenant, undertook by doing work themselves upon the
levees to prevent such threatened overflow.  Under such
conditions, as found by the trial court, we are unable to
uphold the defendants' contention that the plaintiffs from
the inception of their entry upon the premises pursuant to
their said lease assumed the risk of losses to result from
defects in the levees which the lessor had expressly cov-
enanted to repair.

[12]   The appellants also contend that the evidence dis-
closes that the breach in the levees from which the plaintiffs'
chief damage arose was caused by the plaintiffs' own acts
in placing and operating upon said levees certain large ma-
chinery, the operation of which and the jarring caused
thereby were directly responsible for the breach in the levees
which occurred within a short distance from where such
machinery was being thus operated.   There is some evidence
which tends to support that contention, but the trial court
did not deduce therefrom the conclusion which the defend-
ants upon this appeal would have us draw.   On the contrary
the trial court expressly found that the operations of the
plaintiffs in seeking to repair said levees were ''properly
and skillfully done,'' and further expressly found that the
said break in said levee was was not due to said assigned
cause; and we are unable to say that these findings are con-
trary to or are not supported by the evidence, taken as a
whole in the case.

[13]   Having thus arrived at the conclusion that the
plaintiffs were entitled to be awarded some measure of dam-
ages for the lessor's breaches of the aforesaid covenants
and agreements of said lease, the next question which pre-
sents itself is as to what the measure of such recovery should
be with regard to those damages claimed by the plaintiffs
to have been sustained by the loss of profits during the years
1918 and 1919 from the portions of said leased lands which
they were unable to cultivate and crop at all on account
of the lessor's breach of his aforesaid covenants.   It is true
that the trial court did not by its judgment award to the
plaintiffs any damages whatever for the loss of such pros-

pective profits; but it is also true that, as we have hereinbefore determined, the particular basis upon which it rested its said judgment was insufficient as a support for the same. Since this case must be retried, it is incumbent upon us to lay down a rule for the guidance of the trial court in the fixation of such damages. We do not agree with the defendants' contention that these damages are entirely too speculative and uncertain as to be beyond the realm of ascertainment or allowance. In the case of *Shoemaker* v. *Acker,* 116 Cal. 239 [48 Pac. 62], this court gave quite careful consideration to the question as to the recoverability of prospective damages arising from the failure of the defendant to permit the plaintiff to proceed with the management and cultivation of certain lands. It was the contention of the defendant in that case that the profits to arise from the cultivation of said hitherto uncultivated lands were too speculative and remote for recovery in damages; but this court held otherwise, and in so doing declared that ''where loss of prospective profits is the natural and direct consequence of the breach of the contract they may be recovered; and he who breaks the contract cannot wholly escape on account of the difficulty which his own wrong has produced in devising a perfect measure of damages.'' In the case of *Meer* v. *Cerati,* 53 Cal. App. 497 [200 Pac. 501], the plaintiff, as lessor, sued the lessees for damages for their failure to plant rice and other crops upon premises upon which they held a cropping lease, and the defense was made that prospective profits from unplanted crops were. too speculative and uncertain for recovery in damages. The trial court, however, allowed expert testimony to be introduced concerning the probable profits from the planting of the leased lands to the designated crops, and the appellate tribunal upheld its action in so doing on the authority of *Shoemaker* v. *Acker, supra.* The court, however, as in the latter case, referred to the disadvantages and difficulties in the way of providing in such cases an accurate measure of the actual damages sustained. In the case of *McCready* v. *Bullis,* 59 Cal. App. 286 [210 Pac. 638], the court, in dealing with a judgment for the recovery of prospective profits lost through the failure of the defendant to keep his covenant for the supply of water to agricultural lands valueless for cultivation without such supply, emphasized the diffi-

culties of making the proof in such a case adequate to measure with reasonable certainty the actual damage, and, while affirming the principle, reversed the case upon the nature of the evidence admitted in support of the claim for such damages. In the case of *Schumann* v. *Karrer,* 184 Cal. 56 [192 Pac. 849], the rule as declared in the foregoing cases is adhered to and the language made use of in *Shoemaker* v. *Acker* as to the difficulties in making adequate proof as to the actual damage sustained in such cases is quoted with approval. In none of these cases, however, were the courts called upon to consider the validity of provisions in the leases under review providing for liquidated damages, and we incline to the view that in the presence of the suggested difficulties in fixing the actual damages in such cases an inserted agreement in the lease for liquidated damages as to prospective profits in cases such as this should be upheld as within the exception provided for in section 1671 of the Civil Code. [14] An examination of the lease in question will show that the provision therein for the fixation of $40 per acre for the destruction of growing crops through the breach of the lessor's covenant to repair and maintain the levees so as to protect such crops from inundation is severable from the provisions in said lease fixing the sum of $40 per acre as the agreed damages for the general violations of the lessor's covenants. While, therefore, we have held that the first above-mentioned provision is void as to the damages to the grown crop of potatoes destroyed through the breakage of the levee, we are of the opinion that the later and severable provisions of the lease in so far as they furnish an agreed amount of damage for the loss of prospective crops are valid as within the exception provided by section 1671 of the Civil Code.

[15] The appellants' next contention urged both upon their own appeal and upon their motion to dismiss the plaintiffs' appeal is that the plaintiffs are not entitled to a judgment for the return of rentals paid by them and also to a judgment for damages arising by reason of interferences with their use, occupation and cultivation of the leased lands or for the loss of crops in the course of such cultivation. We are disposed to agree with this contention as supported both by reason and by a consistent line of authority. In an extended note to the case of *Toy* v.

*Olinger,* 173 Wis. 277 [20 A. L. R. 1366, 1369, 181 N. W. 295], will be found a full discussion, with abundant citation of cases, covering the rights of tenants who remain in possession of parts or all of the demised premises after breaches by landlords of covenants covering the tenant's use and enjoyment of the leased premises. From the cases therein considered it fully appears that while a tenant who has been thus disturbed or damaged, but who retains possession, may have his election to sue for the return of rents paid or to successfully set off his damage suffered in an action against him for the stipulated rental, he cannot have both forms of relief. In the case of *Stewart* v. *Murphy,* 59 Kan. 421 [Ann. Cas. 1917C, 612, 148 Pac. 609], such double damages were disallowed, and in the notes to that case the limits of the tenant's right of recovery in such cases are quite fully set forth. In the case of *Cauble* v. *Hanson,* (Tex. Civ. App.), 224 S. W. 922, the trial court having allowed recovery for rent paid, also undertook to allow an extra item of damage for a stated breach of the lease. The court upon appeal disallowed the latter item by an application of the rule above stated. We are satisfied that the rule thus laid down has application to the facts of the case at bar. The plaintiffs were entitled to have a recovery of the amount of rental actually paid by them for the years 1918 and 1919, but they were not also entitled to a judgment for the whole damage sustained by them both for crops destroyed and for prospective profits for crops unplanted in the event the trial court allowed them a recovery of the rents paid. In so far, therefore, as the trial court made such double allowance, we think it was in error and its judgment to that extent must be reversed. An examination of the record discloses that the plaintiffs did not, in either their original or their supplemental complaint, plead their right to or pray for the allowance of both of these forms of relief. Whatever recovery of such double remedy as was directed by the judgment of the trial court was without any express insistence of the plaintiffs up to the time of such judgment. It is true that the plaintiffs, in taking their limited appeal herein, have apparently sought to retain the benefit of both forms of relief, and it is also true that they have further accentuated that effort by their

attempts to procure an enforcement of the judgment as to those portions thereof which awarded them such double relief and from which they .did not appeal. But they have been thus far unsuccessful in both of these regards and have not actually received the duplicated damages awarded them by such judgment or any portion thereof. The defendants' prior appeal from the whole judgment and the undertakings given by them upon such appeal have prevented these consequences and it is therefore our opinion that the plaintiffs ought not, by any erroneous action of the trial court or by their own ineffectual effort to take advantage thereof, be foreclosed either from prosecuting their own appeal or from making their election upon a retrial of this case as to which form of relief they will stand upon. These are the real considerations which move us to a denial of the defendants' motion to dismiss or limit the scope of the plaintiffs' appeal.

The appellants' next contention is that the trial court committed several errors in undertaking to define the scope of the plaintiffs' relief. The first of these is urged to be in the fixation of the amounts which the plaintiffs were to be required to pay in order to relieve the premises covered by their mortgage from the prior lien of the trust deed originally securing the indebtedness of John Landers to the San Joaquin Valley Bank, and which by various assignments had come to stand in the name of the defendant, L. J. Grossman. It was the claim of the defendants upon the trial that the original amount of said indebtedness had been largely augmented by the payments of certain outstanding claims and liens affecting said leased lands and which payments had been necessary for the protection of the lien of said trust deed and that they should therefore be given priority under the terms thereof over the lien of the plaintiff's mortgage. We do not deem it necessary to review the evidence in detail touching the alleged increments in the amount required to be paid by plaintiffs in order to entitle them to a cancellation of said trust and of the indebtedness secured thereby, since we are satisfied that the findings and judgment of the trial court thereon are supported by the evidence in the case and will not therefore be reviewed upon this, the defendants' appeal.

[16] The appellants' next contention under this head is
that the trial court was in error in that portion of its judg-
ment which required the holder of said promissory note
and of the trust deed securing the same (neither of which
original documents had been produced at the trial nor
presented in evidence) to deposit the same with the clerk
of the court within a stated time after the entry of said
judgment, to the end that they might be surrendered to
said plaintiffs upon their deposit and payment of the
amount found due thereon and secured thereby; and that
in the event of the failure of the holder or holders of
said instruments to so produce and deposit the same they
should be held and adjudged to be canceled without the
making by plaintiffs of the payments on account thereof
to be made upon their production pursuant to the order
of said court. If such is to be deemed the scope and
effect of the judgment and order of the trial court in the
foregoing regard, then we think it would be clearly error;
for while the failure or refusal of the holder or holders
of said original documents to produce and surrender the
same in accordance with the direction of said court might
be held to be contempt of the court and of its said order,
this would not justify the court in entirely relieving
the plaintiffs of the duty to pay and satisfy the amount
found to be due upon said original indebtedness and the
trust deed securing the same and which the trial court
had properly held to be a first lien upon the premises
upon which the plaintiffs' mortgage was held to be a
second lien.  We are not by any means assured, however,
that the foregoing interpretation of the terms of said
judgment insisted upon by the appellants is to be deemed
the correct one, since the said judgment and order does
not expressly so declare.  The utmost that we think may
be said in criticism of that portion of said judgment is
that it fails to state with sufficient clarity what course
should be pursued by plaintiffs to be relieved of the burden
of said prior indebtedness and lien in the event of the
failure or refusal of the holder or holders of said original
documents to make surrender of the same pursuant to the
court's direction.  This is not a matter in itself calling
for reversal but for clarification upon the otherwise in-
evitable retrial of the case.

[17]   The appellants' next contention is that the trial
court was in error in the insertion in its said judgment
of the provision that as to the defendant L. J. Grossman,
in the event that the premises embraced in plaintiffs' said
mortgage should not upon the sale thereof under the order
for the foreclosure of said mortgage produce an amount
sufficient to pay the amounts found due to the plaintiffs
and secured thereby, together with the costs and expenses
of such foreclosure sale, a deficiency judgment should be
docketed for the balance due against said Grossman, and
that the said plaintiffs have execution against said de-
fendant Grossman therefor.   We think that for several rea-
sons this contention must be sustained.   John Landers
and his wife, the original makers of said mortgage and
the persons primarily liable for the breaches of the cove-
nants of the lease, the performance of which said mort-
gage was given to secure, were not made parties to this
action.   The main breaches in the covenants of said lease
which constitute the bases of the plaintiffs' several claims
for restitution and damages occurred prior to the date
when said defendant Grossman became a transferee of said
lease mediately from Landers and also prior to the time
when he became the holder of the Landers' deed of trust
and of the obligation or obligations which it was given
to secure and also before said Grossman became the record
holder of the title to the premises covered by the plaintiffs'
said mortgage.   The trial court expressly found that the
said defendant Grossman in each and all of the several
transactions by which he became the assignee of said
lessor, the transferee of said deed of trust and of the
obligation it secured, and the holder of the title to the
premises themselves, was at all times acting as the agent
of his codefendant, the Chicago Bonding & Surety Com-
pany, and not otherwise.   Whether or not these latter find-
ings are sustained by the evidence is a matter of no
present concern since the plaintiffs have not assailed them
in their appeal and since the defendants upon their appeal
upon the whole record are entitled to claim that they are
inconsistent with a judgment against a mere agent while
his principal therein is absolved from liability.   Whether
the plaintiffs would or would not be entitled at the last
analysis to a personal deficiency judgment against any other

than their original lessor and mortgagor we do not propose, in view of the entangled state of the present record, to decide, but we are satisfied that upon the foregoing findings they were not entitled to a personal deficiency judgment against the appellant Grossman.

There are· a number of particulars in respect to alleged discrepancies between the plaintiffs' pleadings and the amount of the judgment awarded them upon particular items of damage, but these will doubtless be rectified upon a retrial and are not, therefore, worthy of especial treatment in an already long drawn out opinion. There are also a number of respects in which the defendants upon their appeal urge the trial court was in error in its rulings and conclusions, but in the main we think that these are disposed of in dealing with the principal questions presented and most elaborately argued upon both of these appeals, and which will doubtless be avoided upon a retrial of the cause.

The judgment is reversed.

Myers, C. J., Waste, J., Lawlor, J., Seawell, J., Shenk, J., and Lennon J., concurred.