[L. A. No. 5517. In Bank.—October 7, 1920.]

## R. C. FERDINAND SCHUMANN, Respondent, v. JOSEPH KARRER, Appellant.

[1] LANDLORD AND TENANT—ACTION FOR BREACH OF LESSOR—RIGHT TO UNUSED PORTIONS OF PREMISES—INSTRUCTION.—In an action by a lessee to recover damages for breach of certain covenants contained in a lease of a butcher-shop and adjoining slaughter-house on defendant's farm and to enjoin interference with the use of the premises, an instruction that in the absence of a designation by the plaintiff of any part of the premises which the defendant might use or occupy, defendant would have no right to use or occupy any of the same, was without application either to the issues or the evidence, but without prejudice, where there was no showing that defendant sought to use the premises not needed by the plaintiff, or that any occasion existed for a designation.

[2] ID.—LEASE OF BUTCHER-SHOP AND ADJOINING SLAUGHTER-HOUSE—BARN CONNECTED WITH BUSINESS INCLUDED—CONSTRUCTION OF LEASE.—Where a lease of a butcher-shop and adjoining slaughter-house on the lessor's farm provided that it is understood and agreed that the lessee shall have the right to occupy and enjoy all said property connected with said slaughter-house that he may deem essential or necessary to properly and efficiently carry on his business, the lessor's barn which he had used in conducting the business was included.

[3] ID.—ACTION FOR BREACH—DAMAGES—EVIDENCE—PROFIT ON HOGS. In an action by a lessee to recover damages for breach of certain covenants contained in a lease of a butcher-shop and adjoining slaughter-house and to enjoin defendant's interference with the use of the premises, testimony of a butcher, who had formerly been in defendant's employ, that defendant made a profit of four or five dollars on each of the hogs which he sold at wholesale was competent, relevant, and material upon the issue of damages.

[4] ID.—LOSS OF PROSPECTIVE PROFITS—INABILITY TO PURCHASE AND FATTEN HOGS.—In such an action, testimony of the plaintiff as to the amount of loss which he had sustained by reason of not being able to purchase and fatten hogs and dispose of them because of defendant's interference was competent, relevant, and material as to prospective profits, since such profits would have been one of the direct results of the conduct of the business but for defendant's interference.

[5] ID.—BREACH OF COVENANT NOT TO ENGAGE IN BUTCHER BUSINESS—MATTERS EMBRACED IN BUSINESS.—Where, in an action to recover damages for breach of certain covenants contained in a lease of a butcher-shop and slaughter-house, the plaintiff claimed that the defendant had breached a covenant that he would not carry on the butcher business during the term of the lease, it was material to show what the business embraced.

[6] ID.—BUYING AND FATTENING OF HOGS AS PART OF BUSINESS—EXCLUSION OF EVIDENCE HARMLESS ERROR.—In such an action, error in refusing to allow testimony as to whether the buying and fattening of hogs was any part of the butcher business was not prejudicial, where it was shown by the evidence that the parties clearly intended that the business should include the fattening of hogs for market.

[7] ID.—CAPACITY OF PLANT — EXCLUSION OF EVIDENCE HARMLESS ERROR.—In such an action, the exclusion of the opinion of a witness as to the capacity of the slaughter-house plant was error, but without injury, where there was positive evidence on the point.

[8] EVIDENCE—CONCLUSION OF WITNESS—REFUSAL TO STRIKE—WHEN HARMLESS.—The refusal to strike out the answer of a witness as a conclusion and not testimony as to a fact is not prejudicial where another witness gave testimony of similar import without objection.

APPEAL from a judgment of the Superior Court of San Diego County. W. R. Guy, Judge. Affirmed.

The facts are stated in the opinion of the court.

Crouch & Chambers and Philip Storer Thacher for Appellant.

Sweet, Stearns & Forward, Gustave Duschnes, Richard Kew and R. Sherman Lacey for Respondent.

LAWLOR, J.—This is an appeal by the defendant, Joseph Karrer, from a judgment in favor of the plaintiff, R. C.

Ferdinand Schumann, in an action to reform a lease and to recover damages for the breach of certain covenants therein contained.

On February 18, 1915, the defendant executed and delivered to the plaintiff a lease of his butcher-shop and adjoining slaughter-house on his fifteen-acre farm in the town of El Cajon, San Diego County. The term of the lease was two years, commencing March 1, 1915. After bounding the premises leased the instrument proceeded further to describe the property: "together with all improvements thereon, including the butcher-shop; . . . also machinery, fixtures, tools, appliances, and appurtenances now in or used in connection with said butcher-shop or the butcher business carried on and conducted upon and about said premises; also the slaughter-house now owned and used by said lessor in connection with the butcher business, together with sufficient corrals for all hogs, cattle and other stock; scales, runways, water, water appliances, fixtures and all personal property used in connection with said slaughter-house or said butcher business, and by the use of the word 'sufficient' it is understood and agreed that said *lessor* shall have the right to occupy and enjoy, during the term of this lease, all said property connected with said slaughter-house that he may deem essential or necessary to properly and efficiently carry on his business; but any property not used by said *lessor* at said slaughter-house shall remain subject to the use of said lessor." (Italics ours.) In addition to the usual covenant of quiet enjoyment the lease contained this provision: "It is further agreed that during the existence of this lease, said lessor will not personally, or by or through any agent or representative, carry on the butcher business in or about the El Cajon Valley, and that he will not do, take or perform any act or thing that would tend to lessen the business of said lessee in connection with the property hereby leased."

The complaint alleged that through the mutual mistake of the parties the word "lessor" was used, as indicated by our italics, in that portion of the lease first above quoted instead of the word "lessee," as they intended; that the defendant had breached the covenant of quiet enjoyment by refusing to allow plaintiff to use a barn, situated on the premises and connected with the slaughter-house, or the cooling-room in the said slaughter-house, or to bury offal on

the premises, by interfering with the plaintiff's workmen, and by removing a quantity of bones which the plaintiff had stored on the premises; and that defendant, in violation of the second portion of the lease above quoted, had, ever since the date of the execution of said lease, carried on the butcher business in El Cajon Valley. Damages were sought in the sum of five thousand dollars. On the trial the plaintiff moved to dismiss a jury which had been impaneled, and have the court try the issues of fact relating to the reformation of the lease. The motion was granted over the defendant's objection. The court made findings of fact, substantially in accordance with the allegations of the complaint, and conclusions of law, and reformed the lease. The issue of damages was tried before the jury, which returned a general verdict in favor of the plaintiff in the sum of $2,940, and a special verdict that the items of plaintiff's damages were (1) fifty dollars "by reason of loss of bones"; (2) ninety dollars "by reason of loss of hay"; (3) eight hundred dollars "by reason of loss of meat from fly-blow"; (4) one thousand dollars "by reason of defendant's interference with plaintiff's workmen upon the leased premises"; and (5) one thousand dollars "by reason of the defendant being engaged in the butcher business" since the date of the execution of the lease. The court thereupon rendered judgment reforming the lease, enjoining the defendant from interfering with plaintiff's quiet enjoyment of the premises during the term of the lease, and from carrying on the butcher business in El Cajon Valley "so long as the plaintiff is carrying on a like business therein," and awarding damages to the plaintiff in the sum of $2,940. A motion for a new trial was interposed on behalf of the defendant and denied.

1. To quote from appellant's brief, "it is conceded that the defendant at times acted in excess of his legal rights," but the contention is made "that the plaintiff was permitted by the trial court to prove his case to the jury in utter disregard of the rules of evidence, and that the court, in its rulings and instructions, so misinterpreted the issues and the law relating thereto, that the defendant was prevented from having even a semblance of a fair trial." Appellant's first assignment of error is to the giving of this instruction: "13. In the absence of a designation by the plaintiff of any part of the leased premises which the defendant might use

or occupy, he would have no right to use or occupy any of the same." It is claimed that "the court extended this lease beyond its plain terms when it held it to cover the entire farm." As has been shown, the lease, as reformed by the court, provided that "any property not used by said lessee . . . shall remain subject to the use of said lessor." The complaint alleges that appellant refused to permit respondent to use the slaughter-house, barn, and cooling-room, or to bury offal on the premises, and that he interfered with respondent's workmen "in and about the said slaughter-house." It is not questioned that under the terms of the lease respondent was entitled to use that portion of the demised premises which he might reasonably deem necessary for the conduct of his business as a butcher. No provision was made that before appellant might use the portion not deemed necessary respondent should designate such portion. Nor, as we understand the position of appellant, is it claimed that he had the right to use any portion which the respondent might reasonably deem necessary for his own use. Aside from the reformation of the lease, the only issues in the case, therefore, were whether the barn, cooling-room, and slaughter-house were necessary; whether respondent used them, and whether appellant had interfered with respondent in such use. On each of these issues the jury found for respondent, and, as we shall see, the verdict finds ample support in the evidence.

[1] Respondent does not claim that appellant was not entitled to use any portion of the premises which he (respondent) should not require, whether or not the latter has designated such unused portion. Instruction 13, therefore, has no application either to the issues or to the evidence and should not have been given. But we do not perceive how the giving of the instruction could have injuriously affected appellant's case before the jury. It does not appear that appellant sought to use the premises not needed by respondent, or that there was any occasion for respondent to designate such portion. The point in dispute was whether appellant interfered with respondent with respect to the portion actually used. This being the only question before the jury, the vice of the instruction was limited to the injection of a false quantity, which we cannot conceive entered

into the solution of the evidence by the jury. In any event, the error was not prejudicial.

[2] 2. We shall next consider appellant's contention that the court erred in holding that the use of appellant's barn was included in the lease. This position is not tenable. Those portions of the lease which we have already quoted state that "it is understood and agreed that said lessee shall have the right to occupy and enjoy . . . *all said property connected with said slaughter-house* that he may deem essential or necessary to properly and efficiently carry on his business." (Italics ours.) The term "all said property" referred, we think, not only to the chattels listed in the instrument, but to the entire realty "together with all improvements thereon, . . . commencing at the east side of the said butcher-shop, and running thence westerly to the west edge of the property owned by said lessor," as the premises are described in the lease. Moreover, it appears that appellant had used the barn in conducting the butcher business; it was, therefore, a part of the property which was "connected with said slaughter-house." It may be assumed there was no question but that respondent deemed it necessary to use the barn. Appellant's contention is, therefore, without merit.

[3] 3. W. B. Jones, a butcher who had formerly been in appellant's employ, and a witness for the respondent, testified that appellant made a profit of four dollars or five dollars on each of the hogs which he sold at wholesale. Appellant objected that the question was incompetent, irrelevant, and immaterial, the objection was overruled, and the ruling is assigned as error. Upon the issue as to the damages caused to respondent's business by the alleged interference by appellant with respondent's use of the leased premises in that business, and upon the issue as to the damages to respondent's business by reason of appellant's rival business in the same line, this evidence was both relevant and competent. It tended in some degree to show the value of the business and the loss to respondent that would probably ensue from appellant's interference and rivalry. The testimony of the witness showed that he was sufficiently familiar with the business to be competent to testify to the profit to be made on each hog.

[4] 4. Respondent testified that the amount of loss which
he had sustained "by reason of not being able to purchase and
fatten hogs and dispose of them," because of appellant's in-
terference with said business, was "a little over one thousand
five hundred dollars." The inquiry was objected to on the
grounds of incompetency, irrelevancy, and immateriality.
It was also objected "that the profits are speculative, and
for the further reason that the fattening of hogs for market,
or the profit derived from the fattening of hogs, is no part
of the conduct of the butcher business." It was not speci-
fied in the trial court, nor is it claimed in the brief on appeal,
that the inquiry called for a conclusion or opinion of the
witness, but after the respondent had answered, a motion
was submitted to strike out the answer "as not responsive
and as stating an opinion and not a fact and incompetent,
irrelevant to any issue in this case." Elliott on Evidence,
volume 3, section 1994, states the rule to be that "where the
evidence shows that an established business of a permanent
character is broken up, or suspended, by the wrongful act
of another, in an action for damages for such wrong, proof
may be made of the profits . . . present and past, for the
purpose of furnishing the jury a basis for the measure of
compensation to which the complainant is justly and properly
entitled." (See, also, *Lambert* v. *Haskell*, 80 Cal. 611, [29
Pac. 327]; *Hawthorne* v. *Siegel*, 88 Cal. 159, [22 Am. St. Rep.
291, 25 Pac. 1114]; *Bryson* v. *McCone*, 121 Cal. 153, [53
Pac. 637]; *Alden* v. *Mayfield*, 164 Cal. 6, 13, [127 Pac. 45];
*Hamer* v. *Ellis*, 40 Cal. App. 57, [180 Pac. 30]; *Nelson
Theatre Co.* v. *Nelson*, 216 Mass. 30, [102 N. E. 926].) And
in *Shoemaker* v. *Acker*, 116 Cal. 239, 244, [48 Pac. 62, 64],
the court said: " 'Prospective profits' as damages present one
of the most difficult subjects with which courts have to deal.
It is not the law, however, that they can never be recovered.
Our own code states the rule to be that the measure of dam-
ages for the breach of a contract is 'the amount which will
compensate the party aggrieved for all the detriment proxi-
mately caused thereby, or which, *in the ordinary course of
things, would be likely* to result therefrom.' (Civ. Code,
sec. 3300.) An examination of the authorities will show that
the cases in which future profits were rejected as 'specula-
tive' or 'too remote' were cases where the asserted future
profits were entirely collateral to the subject matter of the

contract, and not consequences flowing in a direct line from the breach of such contract. Familiar instances of profits which are thus speculative and remote are those which might have been realized on a new contract with a third person which could have been consummated with the proceeds of the contract sued on if the latter had not been broken; for, in such case, the profits on the new contract are wholly collateral to the one broken, do not directly flow from it, and are not stipulated for or contemplated by the parties to the contract sued on. But where the prospective profits are the natural and direct consequences of the breach of the contract, they may be recovered; and he who breaks the contract cannot wholly escape on account of the difficulty which his own wrong has produced of devising a perfect measure of damages. (Sutherland on Damages, 2d ed., secs. 64, 72, 107, 120; *Masterton* v. *Mayor,* 7 Hill, 61, [42 Am. Dec. 38]; *United States* v. *Behan,* 110 U. S. 344, [28 L. Ed. 168, 4 Sup. Ct. Rep. 81, see, also, Rose's U. S. Notes]; *Rice* v. *Whitmore,* 74 Cal. 619, [5 Am. St. Rep. 479, 16 Pac. 501]; *Hale* v. *Trout,* 35 Cal. 229; *Stoddard* v. *Treadwell,* 26 Cal. 308; *Cederberg* v. *Robinson,* 100 Cal. 98, 99, [34 Pac. 625]; *Tahoe Ice Co.* v. *Union Ice Co.,* 109 Cal. 242, [41 Pac. 1020].) In Sutherland on Damages, section 64, the author, after speaking of profits which *are* too remote, says—quoting from a decided case: 'But profits or advantages which are the direct and immediate fruits of the contract entered into between the parties stand upon a different footing. These are part and parcel of the contract itself, entering into and constituting a portion of its very elements; something stipulated for, the right to the enjoyment of which is just as clear and plain as to the fulfillment of any other stipulation. They are presumed to have been taken into consideration and deliberated upon before the contract was made, and formed, perhaps, the only inducement to the arrangement.' " (See, also, *Pacific etc. Co.,* v. *Packers' Assn.,* 138 Cal. 632, 638, [72 Pac. 161]; *McConnell* v. *Corona City Water Co.,* 149 Cal. 60, 65, [8 L. R. A. (N. S.) 1171, 85 Pac. 929]; *Fraser* v. *Bentel,* 161 Cal. 390, 396, [Ann. Cas. 1913B, 1062, 119 Pac. 509]; *Western Union Tel. Co.* v. *Commercial etc. Co.,* 177 Cal. 577, 585, [171 Pac. 317].) The prospective profits from the sale of hogs, calves, and manure would have been one of the direct results of respondent's conduct of the

butcher business if he had not been interfered with by appellant. Clearly, the inquiry was competent, relevant, and material as to prospective profits.

[5] 5. We shall next consider appellant's contention that the court erred in refusing to allow C. M. Kuhlker, a witness for respondent, and William Funk, called by appellant, both butchers, to testify "whether the buying and fattening of hogs was any part of the butcher business." As we have pointed out, the lease contained the covenant that appellant would not carry on the butcher business during the term of the lease. Respondent claims that appellant *had* carried on such business. It was therefore material to show what that business embraced. [6] But, conceding there was error in excluding this evidence, it seems plain that appellant was not prejudiced thereby. The property covered by the lease included the slaughter-house, "together with sufficient corrals for all *hogs,* cattle, and other stock." (Italics ours.) James E. Wadham, the attorney who prepared and supervised the execution of the lease, testified that respondent was to have the use of any or all of the corrals for his livestock; and that prior to the lease appellant had conducted the butcher business on these premises and had raised and fattened hogs for market. Respondent testified that at the time of the execution of the lease appellant had indicated to him a field where he (respondent) could keep his hogs; that appellant had formerly engaged in the raising and fattening of hogs while he carried on the butcher business; and that when the lease was entered into appellant had asked him whether he could have the use of part of the hog corrals for raising his hogs. Fay and Jones testified that prior to the lease the appellant, in the conduct of his butcher business, had raised and fattened his hogs for market, and appellant himself admitted that "since Mr. Schumann leased the place I have been using these fields for my hog business *just as I did before."* (Italics ours.) It is not controverted that for some time before the execution of the lease appellant had conducted the butcher business on the premises, including the raising of hogs. In view of this testimony, and the implied finding of the jury, it must be held that the parties clearly intended that the business which respondent was to carry on should include the fattening of hogs for market.

[7] Touching the question put to the witness Kuhlker asking his opinion as to the capacity of the plant, meaning the slaughter-house and appurtenances in controversy, we think it should have been allowed, for clearly it is not a subject of common knowledge. But Funk testified that "the capacity of the slaughter-house is twelve or fifteen beef, and about the same amount of hogs." Thus, while Kuhlker should have been allowed to testify as to the capacity of the plant, there was positive evidence before the jury on this point. The error was not harmful.

[8] 6. Miles Fay testified that at the time of the lease and thereafter he was using the premises to raise hogs under an "arrangement" with appellant. He further stated that respondent did not engage in the raising of sows and pigs, and was then asked, "Do you know why?" To this appellant objected that it was immaterial, but the objection was overruled, and the witness answered, "Why, simply because he didn't have room enough." The appellant moved "that the answer be stricken out as a conclusion and not testimony as to a fact," whereupon the motion was denied, and the ruling is now assigned as error. In strictness, it may be said the question only called for a categorical reply and appellant was not precluded from moving to strike out a complete answer to the question. But Jones, without objection by appellant, gave testimony of similar import, and upon no theory was the ruling prejudicial.

7. Respondent testified that appellant had locked, and refused to allow him to use, the cooling-room on the premises, by reason of which he had suffered damages because of his meat becoming "fly-blown." On cross-examination he was asked, "After your mother came back, did she not have a conversation with Mr. Karrer regarding this difficulty, and as a result of that did not Mr. Karrer open that cooling-house door . . . and told you and your mother that you were at liberty to use it?" Respondent objected to the question on the ground that it was not "cross-examination and calling for a conclusion of the witness," and the objection was sustained. Appellant contends that this ruling was erroneous Appellant himself later testified that "at Christmas-time Mr. Schumann's mother came down to the slaughter-house and the tank-house door was mentioned. She asked me to open the door, and I told Mr. Schumann that the door was

open. I had opened the door previous to that." Assuming that the question was properly framed, we cannot say, in view of the entire evidence, that the error could have affected the verdict.

8. The loss on account of meat becoming "fly-blown" was due, according to respondent's testimony, to the fact that the "screen-room" in which he kept the meat after having been excluded from the cooling-room was not as dark as the cooling-room and admitted flies. The court sustained respondent's objections to these questions, put to respondent on cross-examination, whether he could not have made the "screen-room" as dark as the cooling-room by putting up "some cheap black cloth"; and whether he could not have accomplished the same result and minimized his loss from "fly-blown" meat "at a very slight expense." Appellant now claims that the objections should have been overruled, for the reason that the answers thereto would have tended to show that respondent did not "use all reasonable means to arrest his loss," citing 13 Cyc. 71. Even if it be assumed that this evidence should have been admitted, nevertheless when respondent was subsequently asked what measures he took "to provide a fly-proof, dark place," no objection was made, and the witness answered the question. He further testified: "I don't believe that I could at slight expense have made that screen-room as good a place to keep meat . . . because of the flies and the ventilation." It cannot be said that appellant was prejudiced by the error, if any there was, in the rulings complained of.

9. For the purpose of minimizing any damage to which respondent might be entitled by reason of being unable to raise hogs for the market, appellant testified as to the cost of killing, dressing, and delivering them. Appellant claims that the court erred in refusing to allow him to state how much time it took to deliver the hogs which he sold. He had previously testified, however, that it cost twelve cents per hundred to haul them to market. This estimate of cost undoubtedly took into account the time consumed in delivery.

10. Funk testified that for ten years he had used an old slaughter-house (not the one leased by appellant to respondent for that purpose) on the premises. To quote appellant's brief, "it was sought to show by him that the old slaughter-house had no cooling-room and no facilities for keeping flies

off the meat and that no loss from fly-blow had occurred. The court refused to permit him so to testify. We think such evidence would have cast suspicion on the *bona fides* of plaintiff's claim on this item of loss and that the court erred in excluding the evidence.'' With this we cannot agree. There was no showing that respondent operated under the same conditions as Funk. The fact that there was no loss from ''fly-blown'' meat in a certain slaughter-house at one time would not tend to prove that no such loss would occur at another time and in a different slaughter-house.

11. We now turn to a discussion of appellant's contention that the first four items of the special verdict are ''unsupported by the evidence.'' As to the item of fifty dollars damages sustained ''by reason of loss of bones,'' the complaint alleged that the appellant ''has, without plaintiff's knowledge or consent, taken away and converted to his own use bones belonging to said plaintiff.'' Appellant admitted: ''I may have sold some of Schumann's bones.'' Jones testified that dry bones were worth about twenty dollars per ton. We think the evidence was clearly sufficient to sustain this portion of the verdict.

As to the item of ninety dollars ''by reason of loss of hay,'' Jones further testified that appellant's hogs had destroyed ''between five and six tons'' of hay, which was at that time worth about fifteen dollars per ton. From this the jury was justified in finding that respondent had been damaged in the sum of ninety dollars.

Respondent testified that he had weighed the meat which he had lost through its being ''fly-blown''; that ''it averaged about ten pounds a day,'' for 360 days; and that he had kept a memorandum which showed a loss from that source of $946. The jury found that the respondent had been damaged ''by reason of loss of meat from 'fly-blow' '' in the sum of eight hundred dollars, and in our opinion this finding is supported by the evidence.

The fourth special finding of the jury was that respondent had suffered damages ''by reason of defendant's interference with plaintiff's workmen'' in the sum of one thousand dollars. Jones testified that appellant had hindered him in the use of the slaughter-house and had nailed up the cooling-room; and that appellant had refused to allow him to use the hog corrals, because of which the witness was forced to

move the hogs out of one of them. Respondent testified that appellant frequently insisted on using the slaughter-house to the exclusion of the witness; that because of the exclusion of the respondent and his workmen from the cooling-room he was obliged to expend thirty dollars or thirty-five dollars on building another room; that due to appellant's refusal to allow him to use the barn, he "had to employ a couple of men to lug the hay from the barn over to this place [indicating on a diagram]"; that he found it necessary to hire a Mexican to dig a hole in which to bury offal which appellant had refused to allow to be disposed of in any other way; and that appellant had built certain fences so that the distance which respondent's workmen had to traverse in going from the slaughter-house to the "hide-house" was greatly increased. Fay stated that on many occasions the appellant had excluded respondent and his workmen from the slaughter-house. We cannot say that, upon all the evidence on this issue, the finding is without support.

12. Appellant next assigns error to the refusal of the trial court to give fourteen instructions which he had requested. Assuming that the claim is properly presented in the brief, it is based upon his assignments of error in the rulings on evidence, and, since we have already disposed of those contentions, it will be unnecessary to discuss this point.

13. Finally, it is contended that the court erred in giving twelve instructions. While it may be true that certain instructions, considered separately, do not contain complete statements of the law, we nevertheless find from an examination of the entire charge that any such omissions appear to have been supplied. For instance, appellant makes specific objection to instruction 7, wherein the jury were told that appellant was liable "for *all* damage on account of such breach or interference by the defendant with the . . . quiet enjoyment of the plaintiff." (Italics ours.) It is claimed that herein the court "ignored the qualification that only such damages are recoverable as were *proximate.*" But instruction 32 stated that the plaintiff must show that his loss "was the natural and proximate consequence of the wrongful acts complained of." We think the charge gave to the jury a fair and accurate statement of the law of the case.

It is plain from the foregoing that there is no foundation for the claim that "the defendant was prevented from hav-

ing even the semblance of a fair trial.'' The evidence shows that the respondent was subjected by appellant to a series of aggravating interferences resulting in substantial pecuniary loss, and on the merits it would seem the verdict of the jury was amply justified.

The judgment is affirmed.

Olney, J., Shaw, J., Angellotti, C. J., and Lennon, J., concurred.