CLOVER VALLEY LUMBER CO. v. SIERRA VALLEY CREAMERY, Inc., et al.

Circuit Court of Appeals, Ninth Circuit. May 2, 1927.

No. 5024.

1. **Negligence ⊚⟹136(17)—Evidence of negligent operation of smokestack, causing fire, held sufficient for jury.**

Evidence that defendant negligently operated its smokestack, and that fire, burning plaintiff's building, was caused by cinders therefrom, *held* sufficient to go to the jury.

2. **Appeal and error ⊚⟹260(1), 1050(1)—Reading of letter to jury held not reversible error, exception not having been saved, and the facts recited therein having been testified to by others.**

That letter, objection to admission of which was withdrawn when court ruled that it should not be read to jury, was read to them, *held* not reversible error, where no exception was saved, and where facts recited therein were testified to by others.

3. **Damages ⊚⟹40(3)—Loss of profits by creamery company, by interruption of its business through negligent burning of building, held recoverable.**

The profits of a creamery company not being speculative or collateral, loss thereof by interruption of its business by the negligent burning of its building is recoverable.

In Error to the District Court of the United States for the Northern Division of the Northern District of California; Adolphus F. St. Sure, Judge.

Action by the Sierra Valley Creamery, Inc., and another, against the Clover Valley Lumber Company. Judgment for plaintiffs, and defendant brings error. Affirmed.

The plaintiff in error, hereinafter called the lumber company, brings for review a judgment obtained against it by the defendants in error, hereinafter designated respectively the creamery company and the insurance company. The complaint alleged in substance that the creamery company owned a building of the value of $7,000, and containing personal property of the value of $9,698.63, situate about 250 feet easterly from a box factory owned by the lumber company; that on August 24, 1923, the lumber company negligently operated its smokestack and furnace, with the result that sparks therefrom set fire to the creamery building, and destroyed it and the personal property therein, and destroyed the company's business, to its damage in $10,000, and caused it loss of profits in the sum of $5,000. The insurance company was joined as plaintiff, under allegations to show it to be subrogated to the extent of $5,332.66 to the

amount recoverable by the creamery company. The lumber company answered, and upon the issues a jury trial was had, resulting in a judgment for the plaintiffs upon the verdict of the jury in the sum of $13,000.

Brobeck, Phleger & Harrison, of San Francisco, Cal. (Gregory A. Harrison, of San Francisco, Cal., of counsel), for plaintiff in error.

J. F. Riley, of San Francisco, Cal., for defendants in error.

Before GILBERT, RUDKIN, and DIETRICH, Circuit Judges.

GILBERT, Circuit Judge (after stating the facts as above). [1] Error is assigned to the denial of the lumber company's motion for an instructed verdict in its favor on the ground of lack of evidence to justify the conclusion that the fire was caused by sparks issuing from its box factory, or that it had done or omitted to do any act which an ordinarily prudent man, engaged in the box factory business, would not have done or omitted to do under like circumstances. Looking at the testimony, not with a view to weigh it, but to discover whether there was sufficient to go to the jury, we find the following:

It was shown that in the box factory were a steam boiler and furnace, to which was attached a smokestack extending approximately 60 feet above the roof of the mill and approximately 90 feet in height, with a wire screen at the top, that the smokestack was bent, and the wire screen, which was 9 feet in height, was also leaning, and had been perforated with holes caused by gunshots and rifle-shots, to provide more draft; that the fuel used in the furnace was sawdust and shavings, and, at times, large pieces of slab wood. There was evidence that live cinders and sparks were at times thrown from the smokestack, that the prevailing winds at the time of the fire were from the southwest or the west, and that on the day of the fire a hard wind was blowing from that direction, and toward the creamery company's plant, and was carrying cinders and sparks from the smokestack toward the creamery roof, which was a shingle roof. A witness testified that on one occasion live cinders from the smokestack had fallen upon and scorched his hand. There was evidence, also, that the year 1923 was a particularly dry year.

The fire occurred near midday, and it was first seen by Brandon, a carpenter, who was engaged in shingling the creamery roof.

It started on the side of the roof which faced the lumber company's smokestack. The fire in the creamery furnace had at that time been extinguished. Brandon testified that shortly before the fire he discovered live sparks and cinders from the smokestack falling on the creamery roof, one of which blistered his ear, and that they were coming to such an extent that, in view of the high wind and many hot cinders, he had determined to get off the roof. There was testimony that the lumber company had, prior thereto, received notice of various small fires claimed to have been caused by sparks from its smokestack, and that the smokestack was considered defective. On August 17, 1923, it was notified by Lombardi, the manager of the creamery company, that the Royal Insurance Company had canceled their policy on the creamery building, and that he had applied to the Union Assurance Company for a policy to take its place, but that the risk was refused on account of the lumber company's smokestack, and that another company had threatened to cancel its policy unless within 30 days the smokestack was increased in height and a different screen placed at the top thereof. He testified, also, that the adjuster for the Royal Insurance Company had asked Terwilliger, the lumber company's manager, if his company would not do something to remedy the hazard, "that it was a menace, and that it would eventually burn down the place," and in response to those demands Terwilliger answered that he had ordered 40 feet more stack to be put on top, and he suggested that the creamery company put a fireproof roof on its building, either asbestos or sheet iron, which the lumber company would furnish at cost.

It was shown that after the fire the height of the box factory's stack was increased to 128 feet. There was evidence tending to prove that the perforations caused by shooting holes in the screen were sufficiently large to permit the escape of live cinders, and it was shown that the perforations were made during the two or three months immediately preceding the fire. On the other hand, it is true, there was testimony of experts tending to show that there would be no danger of escape of cinders from a smokestack approximately 90 feet high, using sawdust and shavings for fuel, with a screen such as was in use. But in view of some of their admissions on cross-examination, that the structure was defective if indeed live cinders issued from it, and the admission by one that if there were holes an inch long in the screen, and one of those large sparks should happen

to come in that particular hole, it would go out, we are not convinced that there was not evidence sufficient to go to the jury to sustain the allegation of the complaint that the lumber company negligently operated its smokestack, or that there was not sufficient evidence to indicate that the fire was actually caused by cinders from the box factory's smokestack.

The plaintiff in error argues that, while it is possible under the testimony that the fire was caused by cinders from the smokestack, there was evidence to the contrary in the testimony of Terwilliger, the manager of the lumber company, who said that at the time when the carpenter, upon discovering the blaze on the roof, gave the alarm, fire was coming out of the south end of the building, as if it had been burning in the attic, it was more probable that the fire originated within the building than that it originated on the roof, and to corroborate that view reference is made to the evidence that the electric wires within the building, lying on the top of the ceiling joists, had sagged in places, as showing that sparks from the sagging of the wires were a more probable cause of the fire than sparks from the box factory. But the evidence on the question of the sagging of the wires, or possible fire resulting therefrom, was conflicting, and Terwilliger's was the only testimony tending to show that the fire originated within the building, while Brandon's testimony was so explicit as to the falling of the cinders about him while he was working on the roof, the origin of the fire in the roof itself, and the absence of fire underneath the roof, that the question of the cause of the fire was peculiarly one for the decision of the jury, who heard and saw the witnesses, and we think the motion was properly denied.

[2] Error is assigned to the admission in evidence of a letter written by the insurance company to its agent, Duncan, and by him forwarded to Lombardi, the manager of the creamery company, and by the latter mailed to the lumber company. The letter advised the agent of the insurance company to cancel certain policies of insurance on the creamery building and it contained the following:

"According to the adjuster's report, this fire was caused by hot cinders from smokestack of the Clover Valley Lumber Company box plant. In addition to the above report of Mr. Paterson, we have before us a most full report of all conditions from Mr. William P. Barry, the adjuster who handled the loss for the Royal Insurance Company. It seems from his investigation that this smoke-

stack is a very serious hazard to the Sierra Valley Creamery, and the adjuster recommends that the companies cancel their liability unless this hazard is eliminated, as he believes it only a case of time when a more serious fire will occur and we will be called upon to pay a total loss. He also stated that while he was on the premises he witnessed two fires that were caused by this smokestack."

It is contended that the letter constituted hearsay testimony, that it was a self-serving declaration, and an unsworn statement of a person not a witness on the trial. The facts as shown from the record are that the letter was offered in evidence while Lombardi was on the witness stand, that it was objected to as containing hearsay testimony upon which the original witness should be produced, but when the purpose of the evidence was stated to be to show that the lumber company had notice of the dangerous condition of the smokestack, and the evidence was admitted under the court's ruling that it be not read to the jury, the objection was withdrawn. Counsel for the lumber company, however, intimated that it might later be necessary to read it to the jury, when Terwilliger should appear as a witness. But when in fact Terwilliger did testify as a witness, and on cross-examination denied that he had ever heard anything about any cancellation of insurance policies in case he did not fix the smokestack, he was shown the letter, and finally admitted that possibly it had been received by him. But the record does not show that it was at any time read to the jury. It is true that in their brief counsel for the defendants in error admits that the letter was read. But, even if such were the fact, there was no error which should result in the reversal of the judgment, for the facts which are recited in the letter were testified to by others, and no exception was saved to the reading of the letter.

[3] Error is assigned to the refusal of the requested instruction to the jury that damages were not recoverable for loss of profits sustained by the creamery company "by reason of the interruption of its business growing out of the fire," and further that the business of the creamery company "was not destroyed, therefore the plaintiffs are not entitled to recover any damages for such loss." The manager of the creamery company testified to loss of profits for the remainder of the month on orders in the amount of more than $550, and there was no testimony to the contrary. There was evidence that the business had increased from year to year,

that at the time of the fire the profits were from $460 to $550 per month, and that the fire interrupted the business until the following June. The profits were not speculative or collateral, and they were such as might be recovered. Schumann v. Karrer, 184 Cal. 50, 192 P. 849. It is to be observed in this connection that on the subject of profits the plaintiff in error itself requested the court to instruct the jury that, if profits were lost as the proximate result of the defendant's negligence, they were recoverable, but that, if the jury found that the business was of such a nature that its profits had not become established at the time of the fire, the plaintiffs were not entitled to damages for loss of profits. We can discover no justification for the requested instruction that the creamery company's business was not destroyed. The evidence is all to the contrary.

The judgment is affirmed.