[Civ. No. 13117. First Dist., Div. One. Nov. 25, 1946.]

MARTIN JEGEN, Appellant, v. LOUIS BERGER, Respondent.

(1)

Edward Dienstag for Appellant.

Frank J. Perry and George Olshausen for Respondent.

SCHOTTKY, J. pro tem.—In August, 1941, one George D. Klein sold a mangle or ironer to respondent under a conditional sale contract. Appellant Jegen, as the assignee of Klein, filed suit against respondent to recover the unpaid portion of the contract price, $965.66. Respondent answered, and also filed a cross-complaint in which he joined appellant Jegen and his assignee Klein as cross-defendants, alleging a one year guarantee in the original sales contract, a lack of fitness of such mangle for its intended purposes, and praying that he have judgment for $12,000 for loss of profits in his laundry business as a result thereof. The jury found in favor of respondent upon his cross-complaint and awarded him $4,000 damages against plaintiff and appellant Jegen, but the jury also found in favor of cross-defendant Klein. From the judgment entered upon the verdict plaintiff and cross-defendant Jegen appeals.

As grounds for the reversal of the judgment appellant urges the following: (1) That the record is devoid of evidence showing an assumption by him of the "one year guarantee" provisions of the sale contract between his assignor

(Klein) and respondent; (2) that respondent failed in his duty to minimize damages; (3) that the court erred in ruling on testimony and in giving certain instructions to the jury; (4) that there is no evidence of loss of profits to support the award of $4,000 damages.

Before discussing these contentions we shall briefly summarize the evidence.

The record shows that late in August, 1941, respondent and George Klein entered into the conditional sale contract whereunder respondent purchased the mangle involved herein. The contract provided that the "reset shirt unit" sold to Berger was "guaranteed for 1 year."

Under the terms of the agreement, the full purchase price for the machinery was $2,188.75, and it was to be delivered to respondent's laundry in San Mateo. The mangle was delivered to respondent in February, 1942. It was not immediately put into operation, but, instead, respondent waited for Klein to paint it. After such painting, it was tested late in March, 1942, and it was discovered that when the motor was started "the machine went a way too fast." A jackshaft was then installed in the mangle to remedy that condition, and it was finally set up for operation in the "early part of April," 1942.

Prior to and at the time that the mangle was first placed into use, respondent had also in operation in his laundry a "French gas mangle" which was operating to capacity. Respondent testified that by then employing the new 120 inch mangle he would get therefrom, on his then business volume (April, 1942), 25 per cent of the volume of production which it was actually capable of handling. He also said that by using the new mangle the normal increase of the volume of his business (from April, 1942) would be about 10 per cent per month for six or eight months to bring his output capacity up to 100 per cent. He also testified, correlatively, that his operating expenses (on that anticipated expansion in volume of work produced) would increase 2 per cent per month until the mangle reached its production capacity.

In this respect, it should here be noted that during the month of April, 1942 (when the mangle was installed) respondent did volume business in the amount of $1,112.22, and had operating expenses in the sum of $465.23. Net profit for the month (adding depreciation of $100.43 to the operating expenses) was $546.56.

After the mangle was set up for use, it was noticed that there were "at least four" "spots" on the mangle cylinder, apparently caused by improper soldering. It would appear that such spots interfered with the evenness of ironing of the material placed into the mangle. It was next noticed that the frame of the mangle was cracked in two places. Two days after the mangle was put into operation, a certain "pinion" gear therein broke, and by virtue of such breakdown, use of the mangle ceased for "about a day." It then developed that the mangle "fed lopsided," which condition persisted during the entire time respondent used it. Certain other "cluster gears" broke down after the mangle had been in use for "a week or ten days." Certain other defects arose therein, and, in July, 1942, respondent had to discontinue all further use of the mangle.

The record further shows that about "10 days or 2 weeks" after the new mangle was installed in respondent's shop, he dismantled his French gas mangle. The French mangle was not capable of producing the quantity of work which could be handled by the 120-inch mangle, and, although respondent knew of some defects in the new mangle before he dismantled the French mangle, he thought that the new one would be repaired.

Some time around June or July, 1942, appellant Klein negotiated for the transfer to appellant of Klein's laundry supply business. The contract which consummated those negotiations was executed on August 10, 1942. It is evident from the terms of that transfer agreement that appellant took over the entire machinery, equipment and stock in trade of Klein's business, together with all of Klein's "right, title and interest in certain conditional contracts" of sale to named buyers, as per an attached list. Respondent's contract was on that list. Certain obligations of Klein were, by the terms of the contract, assumed by appellant, but *no express assumption* by appellant of Klein's responsibility to respondent on the mangle guarantee was set out in the contract.

Further portions of the evidence will be set forth in connection with our discussion of the contentions made by appellant hereinbefore enumerated.

Appellant's first contention is that the record is devoid of evidence showing an assumption by him of the "one year guarantee" provision of the sale contract between his assignor (Klein) and respondent. Appellant argues that the contract

between Klein and himself did not contain an assumption of the guarantee, that the contract was never reformed or modified to provide for such an assumption, and that he never by any words or actions after the contract was executed held himself out to respondent as assuming the guarantee responsibility. Respondent in reply argues that the two contracts, considered together, show an assumption; that parol evidence was admissible to prove such assumption; that appellant subsequently held himself out as being bound by the guarantee; and that, under section 1589 of the Civil Code which states that ''voluntary acceptance of the benefit of a transaction is equivalent to a consent to all the obligations arising from it, so far as the facts are known, or ought to be known, to the person accepting,'' appellant was liable.

Appellant cites a number of cases which recite the familiar and well-settled rule that an assignee of rights and benefits under a contract is not, by reason of the fact of assignment alone, liable to perform his assignor's obligations under the contract. But, as was stated by our Supreme Court in the case of *Weidner* v. *Ziegler*, 218 Cal. 345, at page 349 [23 P.2d 515]: ''Considerable time and attention is devoted by counsel to the authorities dealing with the assumption of liability under a contract by an assignee thereof. There is nothing mysterious about the rule of law announced therein, nor is there any conflict in the cases when read in the light of that which governs, to-wit: *the intent of the parties, construed either by their acts, the subject matter of the contract or their words.*'' (Emphasis added.)

The record shows that appellant did not pay Klein any cash for the transfer of Klein's business to him, but only assumed Klein's obligations. After the transfer, Klein went into the military service. Respondent maintains that such evidence, when considered together with the original sale contract between himself and Klein, is sufficient to illustrate, by clear inference, that appellant was to be bound under Klein's guarantee to respondent. Further, it is contended by respondent that such circumstances as are disclosed by the evidence noted above created ambiguities which were sufficient to allow parol to come in to arrive at the true intent of Klein and appellant on the matter of assumption. In this respect, the record contains Klein's testimony that appellant had agreed to accept all of Klein's ''business liabilities,''

and that appellant had told him that he (appellant) would put the Berger mangle in "good mechanical condition."

Appellant argues that there is no ambiguity in the contract between himself and Klein, and that parol evidence was inadmissible. In the recent case of *Wells* v. *Wells,* 74 Cal.App.2d 449 [169 P.2d 23], this court said at page 456: "The appellant assumes that the above quoted agreement is clearly an agreement for the assignment of wages, and argues that where a contract is clear on its face it is error to admit parol evidence for the purpose of ascertaining the intent of the parties. There has been much written on this subject and it is quite apparent that there is some difference of opinion among the members of the Supreme Court of this state on this issue. (See *Universal Sales Corp.* v. *California etc. Mfg. Co.,* 20 Cal.2d 751 [128 P.2d 665], concurring opinion, p. 776; *Estate of Rule,* 25 Cal.2d 1 [152 P.2d 1003], dissenting opinion p. 17; see, also, *Ermolieff* v. *R. K. O. Radio Pictures,* 19 Cal.2d 543 [122 P.2d 3]; see, also, an article by James P. McBaine entitled *'The Rule Against Disturbing Plain Meaning of Writings,'* 31 Cal.L.Rev. 145; an article by Oliver Wendell Holmes entitled: *'The Theory of Legal Interpretation,'* in 12 Harv.L.Rev. 417; 9 Wigmore on Evidence, 3rd ed., §§ 2458-78.) Much can be said in support of the rule that parol evidence is not only admissible to explain an ambiguity appearing on the face of the document but is also admissible to show that what appears to be a perfectly clear agreement, in fact meant something entirely different to the parties. This seems to be the theory of our statutory law. Section 1856 of the Code of Civil Procedure provides that except in the cases of mistake or imperfection of the agreement, or where the validity of the agreement is in fact in dispute 'no evidence of the terms of the agreement other than the contents of the writing' is admissible, but that 'this section does not exclude other evidence of the circumstances under which the agreement was made or to which it relates, as defined in § 1860.' Section 1860, without limitation, provides: 'For the proper construction of an instrument, the circumstances under which it was made, including the situation of the subject of the instrument, and of the parties to it, may also be shown, so that the judge be placed in the position of those whose language he is to interpret.'

"The function of all interpretation is, of course, to try to ascertain the true intent of the parties. Parol evidence

should not be admitted to vary, to add to, or to subtract from the terms of a written agreement, but it should be, and is admissible, to explain what the parties meant by what they said.''

And in *Universal Sales Corp.* v. *California etc. Mfg. Co.,* 20 Cal.2d 751 [128 P.2d 665], our Supreme Court said at page 761: ''As an aid in discovering the all-important element of intent of the parties to the contract, the trial court may look to the circumstances surrounding the making of the agreement (citing many authorities) including the object, nature and subject matter of the writing (citing three authorities) and the preliminary negotiations between the parties (citing two authorities), and thus place itself in the same situation in which the parties found themselves at the time of contracting. (Citing four authorities.) Also applicable here is the familiar rule that when a contract is ambiguous, a construction given to it by the acts and conduct of the parties with knowledge of its terms, before any controversy has arisen as to its meaning, is entitled to great weight, and will, when reasonable, be adopted and enforced by the court. (Citing two authorities.) The reason underlying the rule is that it is the duty of the court to give effect to the intention of the parties where it is not wholly at variance with the correct legal interpretation of the terms of the contract, and a practical construction placed by the parties upon the instrument is the best evidence of their intention. (Citing two authorities and quoting from another.)''

We are convinced that, measured by the principles set forth in the foregoing authorities, and considering the language of the contract between Klein and appellant and the circumstances surrounding its execution, parol evidence was not only admissible, but was necessary in order to fully understand what was meant by the parties.

■ Furthermore, one of the exceptions to the parol evidence rule is that it does not apply when the person seeking to introduce it was not originally a party to the contract, and is not the successor or assign of a party to it. As was said in the case of *Greve* v. *Echo Oil Co.,* 8 Cal.App. 275, at page 279 [96 P. 904]: '' 'Where the controversy is between a party to a written contract and one who is neither a party to it or a privy to one who is, the rule excluding parol evidence to explain, vary, modify or contradict the writing does not apply. In such case neither the party nor the stranger

to the contract is bound by the rule excluding parol evidence.'' (See, also, *Dunn* v. *Price*, 112 Cal. 46 [44 P. 354]; *Spraul* v. *Garliepp*, 138 Cal.App. 491 [32 P.2d 657]; *Mayfield* v. *Fidelity & Casualty Co.*, 16 Cal.App.2d 611 [61 P.2d 83].)

▇▇ As to appellant's contention that there was no assumption of liability by him, the record contains evidence showing that in several instances subsequent to the August 10, 1942, contract, appellant both by word and act held himself out to respondent as having assumed to make good Klein's guarantee on the mangle.

While appellant refers to portions of the transcript which illustrate that he expressly repudiated any liability to assume Klein's responsibility on the guarantee, these clearly only create conflicts with those portions of the evidence which are in respondent's favor on this issue—and on which conflicts the jury found for the cross-complainant. Under well-settled rules of appellate procedure, this court will not interfere with those conclusions of the triers of fact unless it can be said, as matter of law, that the evidence in respondent's favor does not support such conclusions.

After the deal was concluded between Klein and appellant, respondent told appellant that he (appellant) should repair the mangle, and appellant told respondent to ''get bids'' on the repairs that had to be made. Respondent testified that he procured several bids on the work, and ''a few days later'' appellant visited the laundry and stated that perhaps they ''should give Ross [Ross Machine Shop] the job, because he is a reliable man.'' That occurred some time during the ''first part of October.'' Appellant (on that same day) called Ross on respondent's telephone, and asked Ross what had to be done to the mangle and what the repair charges would be. Appellant then told respondent to get a priority from the War Production Board so that Ross could get a release on a ''frame'' for the mangle. Shortly after respondent received the priority, two men came to his laundry representing to him that appellant had sent them to transport the mangle to Ross's shop, and those men removed the mangle from respondent's place of business. Later, and while the mangle was still in Ross's shop, respondent told appellant that certain ''inspectors'' had checked the mangle cylinder, and found that it could not pass inspection. Appellant replied that ''he would talk to Ross'' and would ''take care of

that part." Later, respondent heard appellant telephone Ross and instruct Ross to "proceed with the work."

Taking the record as a whole, and resolving, as we must, all conflicts in favor of respondent, we believe that there is substantial evidence to support the implied finding of the jury that appellant had assumed the obligation of Klein to guarantee the mangle for the one year period.

Appellant's next contention is that "assuming that there was sufficient evidence from which the jury could find that the machinery involved was defective when delivered to respondent, the respondent failed to (1) repair the machinery himself, or (2) replace it; either of which courses would have minimized any damages to a point where they would have been negligible."

Appellant argues that even if it is to be assumed that the mangle was defective when delivered, it was the duty of respondent to leave the "French gas mangle" in operating condition, and to use it while having the newer mangle repaired or replaced. Having failed to do such, appellant contends, was an unreasonable mode of action which increased respondent's alleged damages by reason of loss of profits.

In making the above contentions, appellant refers to the testimony of respondent (before noted) that defects in the new mangle were evidenced immediately after it was set up —that the frame was cracked, that the gears broke down, and that the mangle "fed lopsided." He makes further reference to the testimony of respondent that, nonetheless, the "French gas mangle" was dismantled within a week to two weeks after the new one was put into operation, and after it was evident that the new mangle was defective.

In reply, respondent contends that all he was required to do was to exercise ordinary care to insure against an unwarranted "piling up" of damages, and, if he acted reasonably in dismantling the French mangle before the new mangle was repaired or replaced, a charge of failing to minimize damages cannot be sustained. (*Ash* v. *Soo Sing Lung,* 177 Cal. 356 [170 P. 843]; *Baker* v. *Borello,* 136 Cal. 160 [68 P. 591].) In the Baker case, *supra,* the court said at page 165: "A party injured by the tort of another must not, by his negligence or willfulness, allow the damages to be unnecessarily enhanced; and if he does so he cannot recover for the increased loss. But *'the measure of his duty in this*

*respect is ordinary care and diligence.'* " (Emphasis added.)

Respondent testified that after the complete breakdown of the mangle in July, 1942, he tried to get another mangle, and that he contacted dealers in San Francisco and "back East" for that purpose. He said that there was then "no possible chance for me to get a replacement of that type of machine anywhere. There was just not any to be had." He tried up until April, 1943, to get another mangle, but "had no success." In April, 1943, appellant drove respondent to Oakland to look at an ironer, but it was apparently decided by them that such ironer was unsuitable, too old and too expensive. It is clear, therefore, that there was evidence that respondent used due diligence in attempting to replace the defective mangle.

As to appellant's contention that respondent did not use due diligence to repair the mangle, there is sufficient evidence in the record that the words and actions of appellant were such as to induce respondent to believe that appellant had undertaken the responsibility of making the necessary repairs.

As to the dismantling of the French gas mangle by respondent, the evidence supports the implied finding of the jury that respondent had reasonable grounds for believing that the needed repairs on the newer mangle would be made and that it would soon be operating efficiently.

■ It is a well established rule that it is the duty of a person injured by wrongful act of another to exercise reasonable care to avoid loss or to minimize the resulting damages. This rule is well expressed in 8 California Jurisprudence 782, as follows: "It is the duty of one who knows he is threatened with detriment, either in person, property or business, through another's breach of contract or tort, to do all that he reasonably can to prevent or minimize the damage, and if he negligently fails to do this, he cannot recover for what he might have prevented. In cases of contract the duty is mutual." (See, also, 15 Am.Jur. 426; in *Vitagraph, Inc. v. Liberty Theatres Co.*, 197 Cal. 694, 697 [242 P. 709]; *Schultz* v. *Town of Lakeport*, 5 Cal.2d 377 [54 P.2d 1110].)

■ However, in the instant case the evidence as to whether respondent had exercised reasonable care to avoid loss or minimize damages was highly conflicting, and the implied finding of the jury in favor of respondent upon that issue finds substantial support in the record.

■ Appellant next contends that the trial court erred in admitting evidence of certain conversations between respondent and other persons outside of the presence of appellant. Appellant does not set out the said evidence in his brief, but a reading of the transcript reference given by appellant discloses that respondent was telephoning Klein's place of business concerning the defects in the mangle and that he was not able to contact Klein on those occasions and nothing was said by Klein's employees which in any way could have been prejudicial either to Klein or to appellant.

■ Appellant's next assignment of error is the trial court's admission into evidence, over appellant's objection, of testimony of respondent that the new mangle was operating only at 25 per cent efficiency when first put into use in April, 1942, and that his contemplated increase in business volume would be 10 per cent per month until the mangle reached its 100 per cent capacity and that his operating expenses would increase 2 per cent per month with each 10 per cent increase in production volume. Appellant contends that the trial court erred in overruling his objection that such estimates were without proper foundation, were purely conjectural and called for the opinion and conclusion of the witness.

The record shows that Berger had been in the laundry business for 11 years. He said that the normal operating capacity of the 120-inch mangle was 18 or 20 feet a minute. He also testified that due to the failure of the mangle to operate, he had to "turn business away," and he "couldn't take care of what he had." He had to send his flatwork out to other laundries.

We think it is clear that under the evidence, respondent was qualified to testify on the matter of how much business he had to turn away, and how much was available to him if he had a completely efficient mangle with which to handle it. It is a matter of common knowledge that during the war years laundries had more businesss than they could handle. Likewise it was proper for him to testify on the issue of how much his operating expenses would increase with increasing volumes of business. Whether his estimates of 10 per cent and 2 per cent, *supra,* were merely conjectural (as contended by appellant) would be proper to test upon cross-examination, but certainly his testimony was admissible for what it was worth.

■ Appellant contends also that the court erred in admitting in evidence three exhibits, one of which, exhibit 18, was a computation of the expected increase in business from April, 1942, until the guarantee ran out in March, 1943, another, exhibit 19, a computation of anticipated gross income figures contained in the last column of exhibit 18, and the third, exhibit 20, a computation of estimated loss of income due to the inability of respondent to realize from the defective mangle its full production capacity from May, 1942, to March, 1943. It is clear that these mathematical computations were based upon the books of respondent and the anticipated increase of volume of business and of operating expenses and the figures were verified by the witness, Brown, bookkeeper of respondent, before the computations were admitted in evidence. They could add little to the testimony of respondent but served to present the figures and estimates in a form that would make the testimony easier to understand. If, as we have already held, it was proper for respondent to testify what his increase in volume of business would have been with the new mangle operating at full capacity and what his increased operating expenses would be, we can see no error in permitting the introduction of these computations as exhibits.

■ Appellant's final contention as to improper admission of evidence is that the court erred in allowing Klein to testify over appellant's objection that appellant had bought his (Klein's) "business liabilities." A reading of the testimony of Klein shows that prior to the time this question was asked he had testified in detail as to the transaction between himself and appellant (Jegen), and that appellant (Jegen) had promised that he would take care of all necessary repairs on the mangle. In view of all this previous testimony, admitted for the most part without objection, no possible prejudice could result to appellant in permitting Klein to answer the further question as to whether appellant had purchased his "business liabilities."

■ Appellant contends that the court erred in giving respondent's instruction No. 6 embodying the provisions of section 1589 of the Code of Civil Procedure as to the assumption of obligations by acceptance of benefits. However, appellant's proposed instruction No. 20, which was also given by the court, also gave in full the provisions of section 1589 and added that said section "applies only where the person ac-

cepting the benefit of the transaction is a party to the transaction, and an assignment of a contract does not carry with it the obligations of the contract unless such obligations are expressly assumed by the assignee. Such an assumption would be binding only as between the assignor and assignee and would give rise to no rights to third parties.'' A party is hardly in a position to complain if the court gives at the request of his adversary party an instruction which the court has also given at his request. Furthermore, as applied to the varied, lengthy and highly conflicting evidence in the instant case, an instruction embodying the provisions of said section 1589 was proper.

Appellant contends also that the court erred in giving certain instructions offered by cross-defendant Klein concerning novation. Appellant does not point out wherein said instructions are erroneous, but contents himself with stating that ''(1) the contract itself does not create a novation; (2) nor did the parties have any dealings concerning the contract after its execution.'' What we have hereinbefore set forth is sufficient to show that there was evidence from which the jury may properly have concluded that there was a novation, and the said instructions were, therefore, not improper.

Furthermore, the court gave the following instruction: ''The cross-complaint of Berger is directed against both Klein and Jegen. It alleges that Jegen assumed Klein's liabilities under the original contract. If you find this is true, then both Klein and Jegen are liable for all obligations under said contract, unless you also find that when Jegen assumed these liabilities (if you find he did so) Klein was released with the consent of both Jegen and Berger.''

The fact that the jury brought in a verdict against appellant Jegen upon the cross-complaint but found in favor of Klein indicates clearly that the jury concluded that Jegen had assumed Klein's obligations under the contract between respondent and Klein and that Klein had been released therefrom. Otherwise they would have found against Klein also.

Appellant's final contention is that there is no evidence to support the award of $4,000 damages against appellant. Appellant asserts: ''The complaint was based upon damages suffered by loss of profits. There was, however, no proof of any loss of profits.'' This contention of appellant is necessarily linked with his objections to respondent's testi-

mony as to the loss of profits sustained by him in his business by reason of the defects in the mangle and its failure to function properly, which objections we have hereinbefore discussed. Appellant concedes that "loss of profits forms a basis for the recovery of a judgment in the amount of such loss of profits" and that "such loss need not be directly and absolutely proved with methodical certainty" but contends that in the instant case the profits claimed were speculative and fanciful. He quotes section 3301 of the Civil Code to the effect that "No damages can be recovered for a breach of contract which are not clearly ascertainable in both their nature and origin," and makes an extended argument as to the weight of the evidence upon which respondent relied to prove damages.

In *Natural Soda Prod. Co.* v. *City of Los Angeles*, 23 Cal. 2d 193, our Supreme Court said at page 199 [143 P.2d 12]: "In addition to other items, plaintiff was awarded damages for loss of profits, which defendant contends was not proved with certainty. The award of damages for loss of profits depends upon whether there is a satisfactory basis for estimating what the probable earnings would have been had there been no tort. If no such basis exists, as in cases where the establishment of a business is prevented, it may be necessary to deny such recovery. (*California P. Mfg. Co., Inc.* v. *Stafford Packing Co.*, 192 Cal. 479, 485 [221 P. 345, 32 A.L.R. 114]; *Gibson* v. *Hercules Mfg. Co. Inc.*, 80 Cal.App. 689 [252 P. 780].) If, however, there has been operating experience sufficient to permit a reasonable estimate of probable income and expense, damages for loss of prospective profits are awarded. (*Sobelman* v. *Maier*, 203 Cal. 1, 9 [262 P. 1087]; *Pacific etc. Co.* v. *Alaska Packers Assn.*, 138 Cal. 632 [72 P. 161]; *Landon* v. *Hill*, 136 Cal.App. 560 [29 P.2d 281]; *Pye* v. *Eagle Lake Lumber Co.*, 66 Cal.App. 584 [227 P. 193]; *Hacker Pipe & S. Co.* v. *Chapman V. Mfg. Co.*, 17 Cal.App.2d 265 [61 P.2d 944].)" And on page 200: "Since defendant made it impossible for plaintiff to realize any profits, it cannot complain if the probable profits are of necessity estimated. (*Sobelman* v. *Maier, supra*, at p. 9; *Schumann* v. *Karrer*, 184 Cal. 50, 57 [192 P. 849]; *Meer* v. *Cerati*, 53 Cal.App. 497 [200 P. 501].)"

And in the case of *Speegle* v. *Board of Fire Underwriters*, 29 Cal.2d 34 [172 P.2d 867], the court said at page 46: "Since proof of the damages suffered may be difficult, 'the

wrongdoer may not object to the plaintiff's reasonable estimate of the cause of the injury and of its amount, supported by the evidence, because not based on more accurate data which the wrongdoer's misconduct has rendered unavailable.' (*Bigelow* v. *RKO Radio Pictures, Inc.* 327 U.S. 251 [66 S.Ct. 574, 580 [90] L.Ed. 652].) 'The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created. . . . That principle is an ancient one . . . and is not restricted to proof of damage in antitrust suits, although their character is such as frequently to call for its application.' (Ibid.)'' (See, also, *Story Parchment Co.* v. *Paterson Parchment Paper Co.*, 282 U. S. 555 [51 S.Ct. 248, 75 L.Ed. 544] ; *Allison* v. *Chandler*, 11 Mich. 542; *Gilbert* v. *Kennedy*, 22 Mich. 117; *Bercut* v. *Park, Benziger & Co.*, 150 F.2d 731.)

In the instant case respondent had been in the laundry business 11 years; it could reasonably be inferred therefrom that he knew the ratio of his operating expenses to his gross volume of business handled. The jury would be justified in believing his testimony that when the new mangle was installed in April, 1942, his then operating volume was only 25 per cent of what that mangle could actually produce. His testimony that he had to turn business away—coupled with the fact that it was common knowledge that all laundries during the war years could get about as much business as they thought they might handle—would give some reasonable basis for his estimate that his business would have increased 10 per cent per month until the mangle's capacity was reached in December, 1942. From that month until April, 1943 [when the guarantee expired] the mangle—on his testimony—would be producing full capacity. However, he was forced to forego acceptance of all of that contemplated volume increase, this because the defective mangle impeded his capacity to ''put the work out.'' Additionally, he testified (as before noted) some of the laundry which he did accept had to be let out by him to other laundries for ironing. While there may be some measure of uncertainty as to the amount of damages suffered by respondent, we believe that the instant case falls within the rules of the cases hereinbefore set forth. The jury was, of course, the judge of the weight of the testimony, and were entitled to rely upon the estimates of loss of business made by respondent as

hereinbefore set forth. Taking, as we must, the record as a whole, we cannot say that there is not substantial evidence to support the award of $4,000 damages.

In view of the foregoing the judgment is affirmed.

Peters, P. J., and Ward, J., concurred.